## In re Ira Barney's Will.

January Term, 1898.

Present: Ross, C. J., Taft, Rowell, Tyler, Start and Thompson, JJ.

*Will—Undue Influence—Burden, when on Proponent.*

The burden is in all cases upon the proponent to establish that the instrument is the will of the testator. In general this fact will be presumed, when it is shown that the testator was of sufficient capacity, and that the instrument was formally executed. But when the proponent draws the will, taking the entire estate, or a large bequest, when he would have taken nothing as heir, while near, needy and

deserving relatives take nothing, and no reason is disclosed which induced the devise to the proponent, and other suspicious circumstances exist, as in this case, the law regards the instrument as unnatural, and casts upon the proponent the burden of proving that it was not procured by undue influence on his part or in his behalf.

APPEAL by contestants from a decree of the probate court allowing an instrument as the last will of Ira Barney. Contested upon the grounds of defective execution, incapacity and undue influence. Trial by jury, at the March Term, 1897, Chittenden County, *Munson*, J., presiding. Verdict and judgment for the proponent. The contestants excepted.

*W. H. Bliss, C. M. Wilds, F. B. Deberville* and *E. R. Hard*, for the contestants, cited Digest, Lib. 34, Tit. 8; Lib. 48, Tit. 10, § 15; *Billinghurst* v. *Vickers*, 1 Phil. 187, 194; *Paske* v. *Ollat*, 2 Phil. 323; *Ingram* v. *Wyatt*, 1 Hagg. Ecc. 384, 394; *Wyatt* v. *Ingram*, 3 Hagg. Ecc. 466; *Cockraft* v. *Rawles*, 4 Notes of Cases, 237; 1 Williams, Exrs. 59 (note 6) 60, 61; *Barry* v. *Butlin*, 1 Curteis 637; *Durling* v. *Loveland*, 2 Curteis 225; *Fulton* v. *Andrew*, L. R. 7 H. L. 448; *Tyrrell* v. *Painton*, L. R. Prob. Div. 151, decided in 1894; *Brown* v. *Fisher*, 63 L. T. 465; *Yardley* v. *Cuthbertson*, (Pa. 1885) 1 Cent. Rep. 647; *Cuthbertson's Appeal*, 97 Pa. St. 163; *Boyd* v. *Boyd*, 66 Pa. St. 283; *Waddington* v. *Buzby*, (N. J. 1887) 9 Cent. Rep. 196; *Boisaubin* v. *Boisaubin*, 51 N. J. Eq. 252; *Smith's Will*, 95 N. Y. 516; *Wheeler's Will*, (N. Y. 1893) 5 Mesc. 279; *Chappell* v. *Trent*, (Va. 1893) 19 S. E. Rep. 314; *Whitelaw* v. *Sims*, (Va. 1894) 19 S. E. Rep. 113; *Higginbotham* v. *Higginbotham*, (Ala. 1895) 17 So. Rep. 516: *Richmond's Appeal*, 59 Conn. 226; *Baylies* v. *Spaulding*, (Mass. 1886) 1 New Eng. Rep. 914; *Smith* v. *Smith*, 67 Vt. 445; *Crocker* v. *Chase*, 57 Vt. 421; *Simpler* v. *Lord*, 28 Ga. 52; *Davis* v. *Rogers*, 1 Houst. (Del.) 44; *Harvey* v. *Sullens*, 46 Mo. 147: 2 Am. Rep. 491.

*Seneca Haselton, D. J. Foster* and *Charles T. Barney* for the proponent, cited *Smith's Exrs.* v. *Smith*, 67 Vt. 443;

*Barry* v. *Butler*, 2 Moore P. C. 480; 1 Curteis 637; 1 Williams on Executors, 165; Jarman on Wills, 6th ed. 49; note to *Hughes* v. *Meredith*, 71 Am. Dec. 129; *Russ* v. *Chester*, 1 Hagg. Ec. 227. The requests were erroneous, being founded upon the false assumption that the proponent sustained a confidential relation to the testator. *State* v. *Perrigo*, 67 Vt. 406; *Winchell* v. *Express Co.*, 64 Vt. 15; *Lucia* v. *Meech*, 68 Vt. 175; *Amsden* v. *Atwood*, 69 Vt. 527. It is not the duty of the court to isolate a part of the facts from the rest of the case. *Foster's Executors* v. *Dickerson*, 64 Vt. 233, 267; *Thornton's Exrs.* v. *Thornton's Heirs*, 39 Vt. 122; *Ashley* v. *Hendee*, 56 Vt. 209.

TYLER, J. The testator, Ira Barney, resided in Essex; his entire estate was from $12,000 to $13,000, which by the will in question he devised to his wife, Caroline, for life, with power to use the income and if necessary the principal for her support, and all that should remain at her decease to the proponent, Charles T. Barney, and his heirs. He appointed his wife, his nephew, Truman B. Barney, and said Charles T., executors.

Ira's heirs-at-law were a brother, Solomon Barney, a sister, Mrs. Oakes, and some fourteen nieces and nephews. His brother and sister and several of his nieces and nephews lived near him; some of them lived in other states. His brother was old, feeble and poor; he had had domestic troubles, had lost his property, and Ira had assisted him in his necessities, and had solicitude for him; his sister had no property of her own and was supported by her daughters, one of whom was in comfortable circumstances; his nieces and nephews were generally in moderate circumstances, some fairly well off; his nephew, Truman, was a prosperous farmer and surveyor, and worth $5,000 to $6,000; the proponent was Truman's only child, and was worth from $2000 to $4000.

Ira and his wife had no children. They exchanged visits with Truman's family, and were more intimate with them

than with the other relatives. When Charles was between ten and twelve years of age, Ira and his wife lived at Truman's two years, and after that the families visited each other frequently, and Ira seemed attached to Charles down to the time the latter went out of the State to live in 1882, he then being about twenty-three years old. Charles afterwards made annual visits to his home, except in the year 1891, and on these occasions visited Ira and his wife, and they visited at Truman's. In April, 1894, Charles returned to his native town to live and practice law in Burlington, after which the relations between them continued friendly and pleasant.

The testator also seemed attached to his sister and his nieces, Mrs. Blood, Mrs. Parker, Miss Oakes and Miss Lucia E. Barney, but there was little evidence in respect to his relations with or regard for his other relatives. Mrs. Green and Miss Barney were so situated in their childhood that they were very often at his house and as children were on pleasant terms with him. The latter was there oftener on account of another grandniece about her own age, who was brought up by Ira. Mrs. Green's family moved into the state of New York when she was thirteen years old, Ira going with them to assist them, after which for thirty years they did not often see each other. During the last ten or twelve years of his life Mrs. Green lived in Burlington, and he was often at her house and manifested a kindly interest in her. Miss Barney was the only child of a deceased brother of Ira; she had obtained a good education by her own efforts, and was a teacher; she had no pecuniary means but her earnings; while she was at college in Burlington, from 1885 to 1889, she saw Ira often, and was on pleasant relations with him and his wife, and he was anxious for her success, spoke of her with pride, was interested in her welfare, and made her small presents; she went to Pennsylvania to teach in 1895.

The proponent is a lawyer, and at the time of the

execution of the will resided in Dallas, Texas. He visited Vermont in the summer of 1890, spending about two weeks at his father's house in Jericho, about five miles from Ira's residence, during which time the testator and his wife visited there. The testator then requested the proponent to draw his will. The latter suggested that as he was not practicing law in Vermont Ira had better employ a Vermont lawyer, and mentioned Mr. Hard of Burlington, who had sometimes been the testator's legal adviser. Charles had never been his legal adviser before that time. Charles left for Texas on the following day, but returned to his father's in May, 1892, when the testator visited him there and again requested him to draw his will. The proponent told him he thought it better for him to employ a Vermont lawyer, but upon being urged finally consented to make a memorandum of what the testator wished embodied in the instrument, and upon his return to Texas to write it and mail it to him. Ira then gave him directions to draw the will, which was the first intimation Charles had that Ira intended to make him a beneficiary. Charles asked him if he did not wish to give something to other relatives, and Ira said, no, that he and his wife had decided to have it made as he had directed. Truman was present when these directions were given. Truman and Charles testified that when Charles asked this question, Ira mentioned the names of most of his relatives, and gave reasons why he did not wish to make bequests to them, Truman and Charles saying nothing. Charles made a memorandum, and Ira directed him to send the will to Truman, as he did not like to write, and should wish to have Truman write for him if he wanted any changes made. Upon Charles returning to Dallas he dictated the will, as directed, to his stenographer, who wrote it out on a typewriter, and Charles sent it to his father, who received it two or three days before the date of its execution. On the day of its execution Truman carried it to Ira, who read it over in the presence of his wife, and

they both said it was just as he had directed. Ira then suggested that they should go over to Brown's store where he could execute it. This was done, and the will was signed in the presence of the attesting witnesses and of Truman. No question arises in respect to the formal execution of the instrument. It appeared by Truman's testimony that Ira had possession of the will after its execution until Jan. 20, 1896, when Ira handed it to Charles with a considerable part of his assets.

The foregoing are the facts that the evidence of the respective parties tended to establish. All the evidence relative to the inception of the plan of the will, the direction about drafting it, the drafting and sending it for execution, Ira's reading it, and his subsequent possession of it, and the evidence about the transfer of property to Charles, came from Truman and Charles. No other relative knew that he had made or intended to make a will. He was seventy-nine years of age when the will was executed, June 11, 1892. His wife was then living and was four years his junior. She died in February, 1894, after which Ira remained a few weeks in his house and then visited at Truman's, and with other relatives and friends, until Sept. 1, 1894, when he moved his furniture to Truman's and remained there until he died. The testator had a common school education, was close in business, of average ability, and retained his mental faculties well till within a day of his death, which occurred February 2, 1896. It appeared that if he had died intestate, his brother, his sister, Truman, and Lucia E. Barney would each have inherited an eighth of his estate, and the other four-eighths would have gone to the other nieces and nephews.

During Ira's last sickness, from December 21, 1895, to February 2, 1896, the proponent and his father attended and nursed him, and one or both were in almost constant attendance upon him. During this period the proponent received from the testator various sums in cash and in

orders on savings banks, amounting to $6,400, which he claims as gifts from the testator, Truman, at Ira's request signing Ira's name to the orders on savings bank books.

The contestants' evidence tended to show that Ira said to one witness, soon after his wife died, that he had willed his property to her, if she outlived him; that he should never let his brother Solomon come to want, but should not give him any property in his own right; also, that he should make a provision for his sister; that he said to another witness in August, 1895, that he was going to give his niece, Lucia Barney, $1000 out of $1200 which Mrs. Beach owed him and was to pay in January; that to another witness he said in the spring of 1895 that he should not pay out any more money for Charles; that he was going to have security for what Charles owed him; that he expressed indignation that Charles and his father were trying to induce him to buy a house for Charles; that he told the witness that his property was going to his wife, for life, and then to his brothers' and sisters' families; that to another witness he said, in the summer of 1895, that he was going to make Lucia Barney a nice present of money, was going to leave his property so Solomon could have something, and provide for his sister; that he expressed discontent with living at Truman's and an intention to return to Essex to live; that upon the witness saying to him she understood that he had given all his property to Charles or Truman, he emphatically denied it, and when told that it was a current report that he had made a will and willed his property to them, he said, "It is false, I have not done it;" that to other witnesses he denied having made a will in favor of Truman and Charles; that he said he had not willed everything to Charles Barney; that he said, "It is no such thing; I never have and never will."

The only exceptions insisted upon are to the refusal of the court below to comply with the contestants' first, second and sixth requests, and to the charge of the court in respect

to the burden of proof of undue influence and of fraud, and to the charge in respect to the effect of the drawing of the will by Charles T. Barney, the principal legatee.

The contestants' 1st, 2nd and 6th requests are as follows:

(1) The jury are at liberty to infer from the fact that Charles T. Barney drew the will, or dictated the drawing thereof that he was attempting to practice a fraud upon the alleged testator in securing the provision made for himself in the will, subject to be rebutted by evidence that the will was the free and intelligent act of the alleged testator;

(2) The jury are at liberty to infer from the transfers of personal property, claimed to have been made to Charles T. Barney during Ira Barney's last sickness, that Charles T. Barney had attempted to practice a fraud upon Ira Barney in respect of the provisions made for Charles T. in the alleged will, unless the jury finds such transfers to have been the free, intelligent act of Ira Barney;

(6) In considering the weight to be given to the fact, that this will was drawn by the proponent, who takes practically the entire estate thereunder, that the testator was nearly eighty years old, that the proponent sustained to some extent a confidential relation with him and was not an heir at law, the jury are instructed that these circumstances form a ground of grave suspicion against the instrument, and call for clear and satisfactory proof that it contained the real intentions of the deceased.

The contestants insist that they were entitled to have their requests complied with, and that the court erred in not charging that the burden of proof was upon the proponent to show that the will was not procured through undue influence. The instructions upon this branch of the case were as follows:

"This inquiry which you are to take up, has three main divisions. In the first place, was this instrument which is

presented executed with the formalities required by the statute? If it was so executed, did the testator have, at the time he executed it, such capacity as the law requires one to have who undertakes the making of a will? Third, if the will was so executed, and the testator had such capacity, was there any such undue influence as prevents the will being considered the real will of Ira Barney?

"On the first two of these questions, the burden is upon the proponent or the plaintiff. The proponent must show by a fair preponderance of evidence, which will be afterwards explained to you, that this will was executed with the formalities required by the statute, and that the testator had the requisite degree of mental capacity at the time of executing it. If the proponent makes out those two issues, then the will is to stand unless the contestants, the defendants, have shown by a fair preponderance of the evidence that, notwithstanding these facts, the will was really the result of undue influence, and was not such a will as Ira Barney would have then made if left to the exercise of the faculties that he had.

*        *        *        *        *        *        *        *

"The fact that one who takes a large interest under a will himself prepares it, standing alone is a suspicious circumstance; whether it is a suspicious circumstance in a particular case is for the jury to say upon a consideration of that with the other circumstances of the case. In some cases that fact might have a very great weight, even a controlling weight, against the validity of the will. In other cases, it might itself be so controlled by other circumstances as to have only a slight weight, in fact, no weight at all, against the validity of the will. But a will can be sustained on less proof as to capacity and knowledge of contents where it is drawn by a stranger than where it is drawn by one interested in its provisions.

"I have already called your attention to the evidence in

regard to this matter, and you see at once that the force you are to give this instruction will depend very considerably upon the confidence you have in the testimony of Mr. Truman Barney. Of course, if you find from his testimony that the will was taken by the testator, and was entirely read over by him in the hearing of the witness, the fact of its having been drawn by Mr. Charles T. Barney has much less importance than it would have if you should consider this testimony not entitled to belief. This is merely a suggestion,—to indicate how you are to treat these matters, and especially as regards the effect you should give to the instruction that has just been presented."

The decisions upon the subject of the burden of proof in such cases have varied with varying circumstances. It is apparent that a rule of general application cannot be formulated. By the civil law, if a person wrote a will in his own favor, the instrument was rendered void. Dig. Lib. 48, Tit. 10, § 15; Lib. 34, § 8. In *Paske* v. *Ollat*, 2 Phil. Ecc. Cas. 323, Sir John Nicholl said: "By the Roman law *Qui se scripsit haeredem* could take no benefit under a will. By the law of England, this is not the case; but the law of England requires in all instances of the sort that the proof should be clear and decisive; the balance must not be left *in equilibrio*; the proof must go not merely to the act of signing, but to the knowledge of the contents of the paper. In ordinary cases this is not necessary; but when the person who prepares the instrument and conducts the execution of it, is himself an interested person, his conduct must be watched as that of an interested person; propriety and delicacy would infer that he should not conduct the transaction; and a *fortiori* in a case where he is the confidential attorney of the deceased; and where the benefit conferred is to a considerable amount."

"The presumption and *onus probandi* are against the instrument, * * * and the *onus* of proof may be increased

by circumstances which may increase the presumption even so much as to be conclusive against the instrument."

The rule in *Paske* v. *Ollat* was modified in *Barry* v. *Butlin,* 1 Curteis, Ecc. Cas. 637, where Baron Parke said that it could not be stated as a rule of law that in every case in which the party preparing the will derives a benefit under it, is the *onus probandi* shifted; that in general the burden is discharged by proof of capacity and the fact of execution, from which the knowledge of and assent to the contents of the instrument are presumed; that all that can be said is that when a person, whether an attorney or not, prepares a will with a legacy to himself, it is at most a suspicious circumstance, of more or less weight according to the facts of each particular case; the amount of the legacy, and the proportion it bears to the property disposed of, and numerous other contingencies demanding care and circumspection and calling upon the court not to grant probate without full and entire satisfaction that the instrument expresses the real intentions of the deceased. See *Durling* v. *Loveland,* 2 Curteis, 225, which approves the doctrine of *Barry* v. *Butlin,* but in which case a will prepared by a solicitor, who was appointed executor and residuary legatee, was pronounced against. Williams on Executors, 167, adopts this as the law in such cases. In *Fulton* v. *Andrew,* 7 Eng. & Irish App. Cas. 448, *Barry* v. *Butlin* and other cases were reviewed, and it was held that no finding of fact could be predicated as to the testator's reading the will upon the testimony of those alone who got up the will and were largely benefited by it.

In *Tyrrell* v. *Painton,* L. R., Pro. Div. 151, decided in 1894, the testatrix had made two wills in favor of Painton, but became dissatisfied with him, and afterwards made another in favor of Tyrrell; a few days later Painton's son brought her a will prepared by himself again giving her estate to his father, which instrument the testatrix signed, the draftsman and a young friend of his attesting it. These two witnesses

testified that the testatrix thoroughly understood and approved of the will when she signed it. The witness Painton testified further that the testatrix, who was ill and confined to her room, sent for him, expressed regret that she had willed her estate away from his father; that she wished to make a new will like her first ones; that she dictated a will and he wrote it down in pencil and afterwards wrote it out in ink. On the contrary there was evidence that the testatrix, after the alleged execution of the last will, expressed dislike to John Painton and complained because his son had brought a strange young man to her room. The probate court held that the burden was upon Tyrrell to show that the last will was induced by fraud. On appeal the three Lords Justices held this was error; that the last will was executed under such suspicious circumstances that Painton should have been required to establish affirmatively to the satisfaction of the court that the testatrix knew what she was doing when she executed the last will.

In *Hughes* v. *Meredith*, 24 Ga. 325, it was held that where the person who writes the will takes a large interest under it, and he a stranger to the blood of the testator, the presumption of law is, that the testator, although signing the will, does not know its contents; the *onus* then is upon him who propounds the will to rebut and overcome this presumption, by showing that the testator does know the contents of the will. In the note to that case, in 71 Am. Dec. 127, it is said: "One who writes a will for another is not thereby incapacitated from taking a benefit under it, as was the case under the Roman law; * * * but if the benefit is considerable, and more especially if the beneficiary is a stranger to the testator's blood, the will is to be viewed with strong suspicion and jealousy, and clear proof that the testator knew its contents, and that it was in accordance with his intentions, is required to sustain it, mere proof of testamentary capacity, and of due and formal execution of the will being insufficient," and numerous authorities are cited in support of this statement of the law.

In *Moore* v. *Spier*, 80 Ala. 129, confidential relations existed between the principal devisee and the testatrix; he was related to her and was her trusted agent, having the general management of her property and business; he had by kindness acquired great influence over her, though it did not appear that this influence was illegitimate, or that it had been unduly, nor at all in fact, exercised in securing the large testamentary provision which she made for him; yet it was held that the burden of proof was cast upon the devisee to show that the will was not superinduced by fraud or undue influence, but was the result of free volition on the part of the testatrix. The soundness of this doctrine was questioned by that court in later cases, where it was held that confidential relations alone, unless coupled with some act done in the premises, did not shift the burden of proof upon the proponent; but that confidential relations together with some act, "as that the proponent initiated the preparation of the instrument, or wrote it himself, or gave directions as to its contents to the draftsman, or selected the witnesses to be present at its execution, and the like," will suffice to cast the burden of proving that the testator was not unduly influenced. *Lyons* v. *Campbell*, 88 Ala. 469; *Bancroft* v. *Otis*, 91 Ala. 279.

In *Eastis* v. *Montgomery*, 95 Ala. 486: 36 Am. St. R. 227, the proponent of the will was the son of the testatrix, executor of the will and one of the chief beneficiaries; he had been the testatrix's general business agent, and was active, not from personal motives, but at her request, in assisting her about the execution of the instrument; held, that these facts did not, combined with confidential relations, shift the burden of proof as to undue influence upon him.

In a later Alabama case it was held that where there is evidence that confidential relations existed between the testator and the proponents, who were the sole beneficiaries under the will, and that the latter were active in and about

the making of the will, the burden is shifted upon them to rebut the presumption of undue influence. *Higginbotham* v. *Higginbotham*, 17 So. R. 516.

The following was held in *Maddox* v. *Maddox*, 114 Mo. 35: "When a confidential relation is shown to exist between a testator and the recipient of his bounty, his influence is presumed to have induced the bequest, and the burden of proof is cast upon the beneficiary to explain the transaction and establish that it is reasonable."

In *Post* v. *Mason*, 91 N. Y. 539, the testator had full testamentary capacity, the will was drawn by an attorney who had for a long time been his counsel, and the will contained a legacy to him; held that this fact alone did not raise a presumption of undue influence.

*Andrews*, J., in matter of *Smith's Will*, 95 N. Y. 517, clearly applies the law to a given case as follows: "Undue influence, which is a species of fraud, when relied upon to annul a transaction *inter partes*, or a testamentary disposition, must be proved, and cannot be presumed. But the relation in which the parties to a transaction stand to each other, is often a material circumstance and may of itself in some cases be sufficient to raise a presumption of its existence. Transactions between guardian and ward, attorney and client, trustee and *cestui que trust*, or persons one of whom is dependent upon and subject to the control of the other, are illustrations of this doctrine. Dealings between parties thus situated, resulting in a benefit conferred upon, or an advantage gained by the one holding the dominating situation, naturally excite suspicion, and when the situation is shown, then there is cast upon the party claiming the benefit or advantage, the burden of relieving himself from the suspicion thus engendered and of showing either by direct proof or by circumstances that the transaction was free from fraud or undue influence, and that the other party acted without restraint and under no coercion, or any pressure direct or indirect, of the party benefited. This

rule does not proceed upon a presumption of the invalidity of the particular transaction, without proof. The proof is made, in the first instance, when the relation and the personal intervention of the party claiming the benefit, is shown. The law is not so impracticable as to refuse to take notice of the influence of greed and selfishness upon human conduct, and in the case supposed it wisely interposes by adjusting the quality and measure of proof to the circumstances, to protect the weaker party and, as far as may be, to make it certain that trust and confidence have not been perverted or abused."

The court proceeds to say that this rule seems to be confined to cases of contracts or gifts *inter vivos*, and does not apply in all its strictness, at least, to gifts by will, and, applying the rule to the case in hand, says: "The mere fact, therefore, that the proponent was the attorney of the testatrix did not according to the authorities cited, create a presumption against the validity of the legacy given by her will. But taking all the circumstances together—the fiduciary relation, the change of testamentary intention, the age, and mental and physical condition of the decedent, the fact that the proponent was the draftsman and principal beneficiary under the will and took an active part in procuring its execution, and that the testatrix acted without independent advice—a case was made which required explanation, and which imposed upon the proponent the burden of satisfying the court that the will was the free, untrammeled and intelligent expression of the wishes and intention of the testatrix."

In *Carroll* v. *Hause*, 48 N. J. Eq. 269 : 27 Am. St. R. 469, the court said: "Against a beneficiary thus having a testator under his control, with power to make his will the will of the testator, especially in a case where the testator has made an unnatural and unjust disposition of his property, the law wisely presumes undue influence, and puts upon the beneficiary the burden of showing affirmatively that when

the testator made his will he did not exercise his power over
the testator to his own advantage, and to the disadvantage
of others having an equal or superior claim upon the bounty
of the testator. See *Dale* v. *Dale*, 38 N. J. Eq. 274, 276."

In *Richmond's Appeal*, 59 Conn. 226, this rule is stated by
the court: "When the person who drafts a will, or partici-
pates in procuring its provisions from the testator, also
occupies a relation of special confidence toward him, and
would not be a beneficiary in the absence of the will, and is
specially benefited by its terms, the presumption of undue
influence arises, and the burden of proof is on him to show
that the will was executed freely and without his influence.
In such case, direct and positive proof that the beneficiary
took part in procuring from the testator the terms and
provisions of the will is not required to raise such presump-
tion; it may be inferred from surrounding circumstances."

In 1 Red. on Wills 516, the law is thus stated: "Gross
inequality in the dispositions of the instrument, where no
reason for it is suggested, either in the will or otherwise,
may change the burden, and require explanation on the part
of those who support the will to induce the belief that it
was the free and deliberate offspring of a rational, self-
poised, and clearly disposing mind." See Schouler on Wills,
§ 246.

Woerner on Administrators says that a presumption
arises against the will when the person who drew the
instrument or conducted its execution is himself benefited
by its provisions; very clear proof of volition and capacity,
as well as of knowledge by the testator of the contents, is
necessary in such case to the validity of the instrument.
But if the beneficiary writing the will is a near relative, who
would take a considerable share of the estate if there were
no will, the presumption which might arise against a
stranger is not applicable to him.

In Wisconsin, Minnesota and Massachusetts, the general
rule is stated that undue influence in the execution of a will

is not presumed; that the proponent ordinarily is not called upon to show affirmatively that there was no undue influence used to procure the making of the will; that undue influence is a defense, and the evidence of it must regularly come from the contestant. *McMaster* v. *Scriven*, 85 Wis. 162: 39 Am. St. R. 828; *In re Hess's Will*, 48 Minn. 504: 31 Am. St. R. 665; *Baldwin* v. *Parker*, 99 Mass. 79. In the latter case, *Hoar*, J., said: "But where the issue of undue influence is a separate and distinct issue, involving proof that the testator, though of sound mind and intending that the instrument, which he executes with all the legal formalities, shall take effect as his will, was induced to execute it by the controlling power of another, we think the weight of authority and the best reason are in favor of imposing upon the party who alleges the undue influence the burden of proving it. And we are inclined to think that this has been the general practice in this commonwealth;" and cites *Tyler* v. *Gardiner*, 35 N. Y. 559; but in that case the court held that, in the circumstances, the burden was cast upon the proponent, though as a general rule the burden was upon the contestants.

This subject is elaborately discussed in the notes to the *In re Hess's Will*, 31 Am. St. R. 665, and these general rules are stated as deduced from many cases cited:

"He who contests the admission to probate of a will, or seeks to set aside such probate after it has been granted, on the ground that the will was procured by undue influence, must assume the burden of proof, and establish to the satisfaction of the court or jury the existence of such influence, and that the will is one of its fruits:" * * * "And when the testator is shown to have been of sound mind, no presumption of the exercise of undue influence over him can be indulged, even though the will is, in the opinion of the court or jury, unreasonable and unjust, and such as ought not to have been made. At least, such is the rule supported by a majority of the cases upon this subject.

The evidence may, however, show certain relations between the testator and the beneficiaries, well calculated to give them an undue influence over him, or that his condition of mind or body was such as to make it probable that he was not able to resist the influence of others, or that the provisions of the will are unnatural and unreasonable, and contrary alike to his duty and his previously expressed intentions, and this evidence, without any other, may often create a presumption of undue influence, and cast upon the proponent of the will the burden of removing such presumption." * * * "As to the relations of the testator and a beneficiary of his will, it is sufficient to remark that the existence of undue influence may be presumed from them, —1. When those relations were of such special trust and confidence as of themselves to warrant the presumption that they have an undue influence over him; and, 2. When they were such as to place him in the power of the beneficiaries or their emissaries at a time when he was too weak, mentally or physically, to resist." Among the relations mentioned are those of guardian and ward, attorney and client, spiritual advisers and persons looking to them for advice—in fact, all relations of trust and confidence in which the temptation and opportunity for abuse would be too great if the beneficiary were not required to make affirmative proof that he did not betray the confidence placed in him; and the editor adds that, "*whenever* the reason of the rule exists, the presence and applicability of the rule itself may generally be affirmed," and cites numerous cases in support of these general propositions.

It was held in *Denny* v. *Pinney*, 60 Vt. 524, that when the due execution of the will, and testamentary capacity of the testatrix, were proved, the law presumed she intended that the legal results of her act should follow; hence, on the issue in regard to undue influence the contestants went forward. This is a statement of the general rule of evidence in the probate of wills.

V. S. 2346, provides that every person of age and sound mind may devise, bequeath and dispose of his estate, real and personal, and section 2349 prescribes the formalities with which a will must be executed. As a general rule the proponent of a will has complied with the statute when he has shown that the instrument was duly executed and that the testator was of testamentary capacity. This the contestants do not controvert, but they contend that the present case falls within another rule by reason of the facts proved.

It must be borne in mind that in all cases the burden is upon the proponent to show that the instrument is the last will and testament of the testator. *Williams, Exr.* v. *Robinson*, 42 Vt. 658; *Roberts, Admr.* v. *Welch*, 46 Vt. 164. In general the law presumes this vital fact from the proven facts, that the instrument was executed by the testator with the formalities required by law, and that he was of testamentary capacity, so that affirmative proof that the will was not procured by the undue influence of others is not required. But where the relations between the testator and the proponent were confidential, and the proponent drew the will, taking the entire estate or a large bequest and would have taken nothing as heir, while near, needy and deserving relatives take nothing, then the law not only regards the transaction with suspicion, but the burden should be cast upon the proponent to show that he did not, nor did any one in his behalf, unduly influence the testator, and that the instrument propounded is the testator's will and not the will of another person. It is of course equally fatal to the validity of a will whether the undue influence was exerted by the proponent or by another person.

It is true that in many of the cases, but not in all, the fact of confidential relations is an element. Other circumstances may cast so much suspicion upon the transaction as to require affirmative proof by the proponent. In this case the testator omitted from the provisions of his will all the persons who were the natural objects of his bounty—some

of whom were objects of his affection—and gave his estate to one who was not an heir-at-law and was the draftsman of the will.  The evidence in the case discloses no reason that operated upon his mind to induce the devise of the whole estate to the proponent.  It does not appear that he had greater affection for him than for some of his nearer relatives whose circumstances commended them to his testamentary remembrance; nor does it appear that Charles had manifested superior financial ability, which sometimes operates upon the minds of careful men when about to make their wills.  The will was therefore unnatural, and especially so in that, while Ira assisted his brother while he lived, his will made no provision for him in his misfortunes and poverty after Ira's death.  The attesting witnesses could not testify that the testator knew the contents of the will; there was evidence tending to show that after its execution he was not aware of its contents.  This was competent.  *Shailer* v. *Bumstead*, 99 Mass. 112.  Truman was interested to have his son secure this property, and was instrumental about the execution of the will.  The history of his subsequent relations with Ira until the latter's death, tends to show that he had influence with him.  During the testator's last sickness, while he was under the exclusive control of Charles and his father, without the knowledge of any other relative, he made over to Charles more than half of his estate. . While these circumstances may be fully explainable, they are suspicious, and the burden is justly cast upon the proponent to show affirmatively that the testator was a perfectly free agent and knew the contents of the instrument he executed.

*Judgment reversed and cause remanded.*