Northern Security Insurance v. Mitec, No. S1167-99 Cncv (Katz, J., Apr. 13, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

NORTHERN SECURITY INSURANCE CO.

v.

MITEC ELECTRONICS, LTD.

ENTRY

This is a case concerning the breadth and width of a General Release signed by a corporation. The plaintiffs seek to extend this Release over the present Mitec defendants to remove their liability as insurers for harms caused by pollution from defendants' former industrial site. Defendants argue that such an interpretation of the release is more than the document

was meant to handle and that it would violate public policy to allow one company to discharge an insurer for all future harms suffered by other corporations.

**Facts**

Mitec Systems Corporation was a Vermont corporation created in 1978 and dissolved in 1989. (Def. Mot. to Dismiss ex. C, Dec. 13, 1999). Mitec Systems was one of a number of corporations that Meyer Bentob created as part of his on-going manufacturing and hi-tech concerns. (Reply to Def. Opp'n to Summ. J. ex. 8, Jan. 7, 2004). At all relevant times, Bentob was the president (or its functional equivalent) and super-majority stockholder in all Mitec corporations. Id. At some point in 1979 Mitec Systems began occupying a leased space at the Alling Industrial Park in Williston, Vermont. (Pl. Mem. in Opp'n to Mot. to Dismiss ex. E, at 7, Dec. 9, 2002). At this site, Mitec Systems manufactured electronic and microwave communication components. In 1984, the State of Vermont investigated the site for pollution and the illegal dumping of hazardous waste. This led to a suit against Mitec Systems in Chittenden Superior Court. (Pl. Mot. for Summ. J. ex. 3, Oct. 15, 2003). Although Mitec Systems was entered as a defendant, Mitec Electronics, Ltd. was also named as a co-defendant and eventually provided a letter of credit to the State as part of the 1986 settlement. (Pl. Mem. in Opp'n to Mot. to Dismiss ex. E, at 8, Dec. 9, 2002). In 1985 and 1986, Mitec Systems and Mitec Electronics were sued by third parties from around the Williston site for environmental damages stemming from the pollution. (Pl. Mot. for Summ. J. exs. 4, 5, Oct. 15, 2003). Throughout 1987, Mitec Systems and its insurance carrier, Northern Security Insurance Company, Inc., settled with these third parties and in exchange obtained general releases from them. Mitec also provided additional money to the State of Vermont to assist with

cleaning the site.  (Pl. Mot. for Summ. J. ex. 2, at 2, Oct. 15, 2003).

Following the 1986 settlement with the State of Vermont, Mitec Systems ceased business operations and sold off its assets to Mitec Manufacturing, Ltd.  (Pl. Mem. in Opp'n to Mot. to Dismiss ex. E, at 8, Dec. 9, 2002).  Both Mitec Electronics and Mitec Manufacturing are Canadian companies that were founded and are owned by Bentob.  (Reply to Def. Opp'n to Summ. J. ex. 8, Jan. 7, 2004).  There is evidence that when Mitec Systems sold its assets, Mitec Manufacturing paid an inflated price of 20% above book value.  (Pl. Mem. in Opp'n to Mot. to Dismiss ex. E, at 8, Dec. 9, 2002).  There is also evidence that during its existence, Mitec Systems carried large debts to Mitec Electronics and Mitec Manufacturing that were listed as loans or accounts payable.  (Pl. Mem. in Opp'n to Mot. to Dismiss ex. E, at 7, Dec. 9, 2002).  These debts were almost always in excess of Mitec Systems' value.  (Pl. Mem. in Opp'n to Mot. to Dismiss ex. E, at 8, Dec. 9, 2002).  As of 1987 Mitec Systems was involuntary terminated by the Secretary of State for failing to file annual reports.  (Def. Mot. to Dismiss ex. C, Dec. 13, 1999).  It was officially dissolved by the Secretary on December 29, 1989.  Id.

On May 16, 1988, Mitec Systems sued Northern Security for indemnification for the settlement of claims and for the additional money it had paid the State for cleaning the site.  (Pl. Mot. for Summ. J. ex. 2, at 2, Oct. 15, 2003).  This lead to a settlement agreement between Mitec Systems and Northern Security on February 16, 1989.  Mitec Systems Corp. v. Northern Sec. Ins. Co., S515-88CnC (Jenkins, J., Feb. 16, 1989).  Northern Security paid Mitec $16,250 to resolve outstanding indemnity claims and in exchange Mitec signed a general release discharging Northern Security.  The relevant language of this release states:

Greeting: know ye, That Mitec Systems Corporation . . . have remised, released, and forever discharged, and by these presents does for its successors, affiliates and assigns, remise, release and forever discharge the said Northern Security Insurance Company, Inc. and its directors, officers, agents, employees, past and present, successors, affiliates, and assigns, of and from all, and all manner of action and actions, cause and causes of action, suits debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents executions, claims and demands whatsoever, in law or in equity, which against the said Northern Security Insurance Company, Inc. ever had, now has or which its successors, affiliates or assigns hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents.

(Pl. Mot. for Summ. J. ex. 1, Oct. 15, 2003). Following this release and the dissolution of Mitec Systems, Bentob consolidated his Mitecs further by winding Mitec Manufacturing into Mitec Electronics in 1992 and forming Mitec Telecom in 1996 as part of a consolidation between Mitec Electronics and another Canadian company. (Def. Opp'n to Mot. for Summ. J., at 5, Dec. 22, 2003).

In 1997, Gerald and Nancy Bates brought suit against the remaining Mitec corporations for environmental damages. (Pl. Mot. for Summ. J. ex. 6, Oct. 15, 2003). The Bates live near the Williston industrial site and had begun to experience the effects of the pollution, which had flowed onto their property through groundwater and seepage. Id. Mitec contacted Northern Security thereafter and sought insurance coverage from this claim. Northern Security, in turn, brought this current action to declare that the

1989 general release relieves them from any responsibility for actions against the Mitec corporations for damages stemming from the pollution at the Williston industrial site.

## Summary Judgment

The question for summary judgment is whether or not the general release signed by Mitec Systems in 1989 should release Northern Security from the present law suit. The question neatly divides into two sub-issues. First there is a question of construction in whether the release should be read to include all future and unknown claims. The second sub-issue is whether the release signed by Mitec Systems should be binding on the remaining Mitec defendants. Much of this is dependant on intent of the parties and the term "affiliates." Both of these questions are issues of contract interpretation, which make them particularly appropriate for summary judgment. See 66 Am. Jur. 2d Release § 28 (scope of release is a question for the court); Morrisseau v. Fayette, 164 Vt. 358, 366 (1995) (absent ambiguity, contract interpretation is a matter of law). While the parties still dispute the exact relationships of the corporations involved, the material elements are not in dispute. Bacon v. Lascelles, 165 Vt. 214, 218 (1996) (summary judgment appropriate where there is no genuine issue of material fact and movant is entitled to judgment as a matter of law).

A release between an insurer and insured is a contract and is governed by the law of contract. Leo v. Hillman, 164 Vt. 94, 104 (1995). The purpose of examining the release is to ascertain the intent of the parties at the time of execution. 15 L.Russ & T.Segalla, Couch on Insurance 3d § 216:8, at 216-11 (1999). If the language is "clear and unequivocal," we will look only to the release and not to parol evidence. Maglin v.

Tschanneral, 174 Vt. 39, 45 (2002) (quoting Lamoille Grain Co. v. St. Johnsbury & L.C. R.R., 135 Vt. 5, 8 (1976)).  In the present case, Northern Security argues that the phrase "ever had, now has or which its successors, affiliates or assigns hereafter can, shall or may have," connotes a release by Mitec Systems of all claims past, present, future, and unknown.  (Pl. Mot. for Summ. J. ex. 1, Oct. 15, 2003).  Mitec argues that this phrase is not clear and that the release is really limited to past and present claims.

As a general principle, releases must be specific to be valid and are interpreted narrowly.  Investment Props., Inc. v. Lyttle, 169 Vt. 487, 497 (1999).  However, the scope of a release is not determined by "magic" words.  66 Am. Jur. 2d Release § 8 (noting that no "magic"words are necessary to create a release).  A release may dismiss future or unknown losses despite the fact that the parties were unaware of them or the claims had not ripened.  Russ & Segalla, § 216:36, at 216-51.  In fact, the general rule is that a general release precludes further action on a policy.  Id.  Only if the parties limit the release to the past is there a clear presumption that the release does not have an effect on future claims.  Id. § 216:37, at 216-52.  The general release here, as Mitec points out, does not use the words "future" or "unknown," but it is also clear from the language chosen that the intent is to make the release as broad and as general as possible.  Instead of "future" or "unknown" Northern Security has substituted the phrase "may or shall have."  Coupled with the general intent of the document, this phrase can have little other meaning.  The document makes clear in later paragraphs that the purpose of this release is to conclude Northern Security's coverage for environmental claims against Mitec.  See (Pl. Mot. for Summ. J. ex. 1, Oct. 15, 2003) (incorporating by reference, but not limiting the scope to, the coverage dispute between the parties).  As the agreement incorporated this dispute into the release, it is fair to reference

this as a frame for the release.  <u>McGee Constr. Co. v. Neshobe Dev.</u>, 156 Vt. 550, 554 (1991).  Mitec and Northern Security had already obtained releases from all third parties that had come forward.  They had also resolved, for the time being, litigation with the State of Vermont through a general release.  And Mitec had ceased operations at the Williston industrial site, ending any future sources of additional contamination.  For that moment, all Northern Security had liability for was either a claim by the parties somehow not covered by their general releases or future claims.  By referencing the Mitec litigation for coverage stemming from its environmental problems, we conclude that the parties intended the release to cover both.

Mitec's final argument against future application centers on the last phrase of the release discussing its scope which says,  "from the beginning of the world to the day of the date of these presents."  (Pl. Mot. for Summ. J. ex. 1, Oct. 15, 2003).   Mitec argues that this phrase limits the release to past or present claims or at least creates enough ambiguity to turn interpretation into an issue of fact.  Taking this phrase out of context, however, obscures its purpose.  Directly before this phrase are the words, "for, upon or by reason of any matter, cause or thing whatsoever."  <u>Id</u>.  As a whole, the phrase is a limitation not on claims, but to the more narrow description of the subject matter of the claims.  The phrase limits the release to cover only Mitec's actions past and present.  Any future pollution or use of the Williston site is outside the scope of the language.  While this is somewhat meaningless in light of Mitec's suspension of activities, it is in line with the guideline that a release may be invalid for being too broad or vague.  Russ & Segalla, § 216:8, at 216-12.  Therefore, the phrase concerning past and present applies to the sources of potential claims and is rightly limited to past and present acts or omissions by Mitec.  Language

concerning the range of claims arising from Mitec's past or present actions remains uninhibited by the phrase and continues to release Northern Security from past, present, and future claims stemming from Mitec's actions prior to 1989 at the Williston industrial park. As the Bates claim falls within this description, the general release is effective against Mitec's request for coverage.

This brings us to the second issue of whether Mitec Systems' release is binding on the other Mitec defendants. Much of this argument revolves around the parties' understanding of the phrase " successors, affiliates and assigns." As a preliminary matter, however, it is important to note that the environmental damage for which the Bates seek to recover and for which Northern Security would potentially indemnify comes from the actions of Mitec Systems. Furthermore, while the Mitec companies appear to have some evidence of intermingled funds, undercapitalization, and unified control through Meyer Bentob, there has not been enough evidence, nor has the argument been fully made by Northern Securities to pierce the Mitec corporate veil and attach liability for the actions of one Mitec defendant on all Mitec defendants. See generally Agway, Inc. v, Brooks, 173 Vt. 262 (2001); Walkovszky v. Carlton, 223 N.E.2d 6 (N.Y. 1966). We will therefore not address the issue of whether Northern Security remains liable to Mitec Telecom, Mitec Electronics, or Meyer Bentob through an independently held policy or the scope of that policy. Instead, we will limit our discussion to the effect of Mitec Systems' release on the other Mitec companies' ability to make coverage claims through the Mitec Systems' policy.

When Mitec Systems released Northern Security, it also agreed to release Northern Security from claims by its "successors, affiliates and

assigns." Northern Security argues that the remaining Mitec defendants fit into one of these three categories. Mitec argues that they do not. For the sake of clarity, the Mitec defendants can be divided into two categories those that were in existence at the time of the release and those that have been created since. Mitec Telecom is of the latter. Since it was not in existence at the time of the agreement and Northern Security's coverage, it could only claim coverage as a successor to one of the Mitec companies in existence at the time of the release. If it were a successor to Mitec Systems, which Mitec disputes, then it would be barred by the release. If it were a successor to either Mitec Manufacturing or Mitec Electronics, the other two then-existing Mitec companies, then its rights to coverage depend on their rights. Specifically, if Mitec Manufacturing and Mitec Electronics were affiliates of Mitec Systems, then no one can claim coverage under its Northern Security policy.

To this end, the Mitec defendants take two approaches. First, they argue that "affiliate" has a precise and technical definition requiring a certain percentage of ownership. Second, they argue that the various Mitec Corporations were in no way connected and were independent of each other. The relationship of the companies, however, paints a different portrait. Aside from a unity of control and ownership vested in Meyer Bentob, the Mitec defendants seem to have worked hand in glove as if part of a larger company, supporting each other and fulfilling individual parts of a larger manufacturing and distribution enterprise. While it is an elementary rule of corporations that liability does not extend to other corporations (short of specific contracts), or officers (short of breaches of fiduciary duty) no matter how closely they work together, the facts illustrate that the Mitec defendants were affiliated in the common meaning of the word in that they were associated and worked with each other. The

question then shifts to whether this understanding of "affiliate" was the same one intended by the parties executing the release or whether they intended some more technical or narrow definition.

The document itself offers no definition of "affliate," but it does use the word as part of a verbal triptych, "successors, affiliates and assigns." This rhetorical device is repeated throughout the document as it reaches for every possible way to describe: who it is releasing; what it is releasing; and even the verb, "to release." Each instance of this verbal overkill demonstrates an intent to cover all possible interpretations of the parties' status and rights. Given the purpose of the release, to end Northern Securities duty to indemnify any further claims from the pollution of the Williston industrial site, there is no evidence to conclude that the parties meant the term "affiliate" in anything other than its common and broadest sense. Furthermore, there is enough evidence to support the conclusion that Mitec Manufacturing and Mitec Electronics were "affiliates" of Mitec Systems. Both were providing financial resources to Mitec Systems. Both appeared on various documents with Mitec Systems, Mitec Electronics on the lease and Mitec Manufacturing on at least one version of the insurance policy. And all three were owned and controlled by Meyer Bentob. Without further evidence illustrating an intent to assign "affilitate" some more obscure meaning, there is no reason to give "affiliate" some narrower interpretation that would exclude the companies here since that would be inconsistent with ordinary and usual interpretations of the word in caselaw and the general intent of the parties at formation. In re Hawkins Brothers, Inc., 1992 WL 381040, *4 (Bankr. D.Vt.) (quoting Gramatan Nat'l Bank v. Beecher, 122 Vt. 266, 370 (1961)). We conclude that the Mitec defendants in existence in 1989 were affiliates of Mitec Systems for the purposes of the release and are effectively precluded from raising any claims against

Northern Security based on the policy held and released by Mitec Systems.

As a final point, Mitec argues public policy cannot allow a general release of future and unknown claims that have not matured at the time of formation. Chubb v. Amax Coal Co., 466 N.E.2d 369, 372–73 (Ill. App. 1984). Applying the reasoning of Chubb to the present case, however, would be inapposite. In that case, Chubb, an employee of the Amax Coal Company, suffered an on-the-job injury. Id. at 370. He was compensated by his employer's insurance company, signed a release with them, became re-employed with Amax, and was re-enrolled in the insurance program. Id. Soon thereafter, Chubb's injuries worsened beyond their anticipated scope, and he filed for benefits. Id. at 371.

The Illinois court concluded that while the release did discharge the insurance company from its original duty, Chubb's re-employment and re-enrollment required the court to suspend its application because doing so would have made the ongoing, re-employment policy a nullity—a statutorily prohibited situation of ongoing employment without required workers' compensation coverage. Id. at 373. In the present case, the insurance relationship between Mitec Systems and Northern Security terminated in 1989. Enforcing the release would not affect an ongoing relationship or nullify a statutory requirement. Moreover, it is fully within the power of a release to end an insurer's liability to an insured for claims arising out of past actions. 66 Am. Jur. 2d Release § 33.

Beyond Chubb, there are several relevant factors to consider when examining a general release for public policy purposes. 66 Am. Jur. 2d Release §16, at 384–85 (outlining some of the factors to consider for public policy before enforcing a release). In this case, both parties were

sophisticated business actors with substantial bargaining power and the advice of counsel. They created a release for actual, realized consideration. They signed a document that was part standardized form, but also part typed, implying negotiations and a bargained-for result. As Northern Security seeks to enforce the release, there is no issue involving the Bates' separate right to litigate or recover for injuries. Enforcement is only sought for a purpose readily apparent from the face of the document.

The only factor that even tickles public policy is the broad amount of time and scope covered by the release. This factor, however, is more than compensated by the previously listed factors and is not in and of itself violative of public policy. See Maska U.S., Inc. v. Kansa Gen. Ins. Co., 198 F.3d 74, 80 (2d Cir. 1999) (citing to caselaw illustrating the limited nature of public policy exceptions). While Mitec may now feel the release is unfair to them, such a bargained-for result does not offend public policy.

Northern Security has met its burden by showing some evidence that the present Mitec Telecom is the successor to an affiliate. On the other hand, Mitec has not shown facts which would tend to rebut that conclusion. Therefore summary judgment is appropriate. Based on the foregoing and consistent with the scope of our analysis, plaintiff's motion for summary judgment is granted. Northern Security is entitled to a declaratory judgment that it is not liable to defend or indemnify the Mitec defendants or Mr. Bentob.

Dated at Burlington, Vermont_____, 2004.

_____
Judge