# In re Estate of Raymond Doran
## (James Doran, Appellant)

[993 A.2d 436]

No. 07-483

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed February 26, 2010

Harry R. Ryan III of Ryan Smith & Carbine, Ltd., Rutland, for Appellant.

John J. Kennelly of Pratt Vreeland Kennelly Martin & White, Ltd., Rutland, for Appellee.

¶ 1. **Burgess, J.** This case involves a dispute among family members regarding the disposition of the estate of Raymond Doran, who died intestate in February 2004. There are twenty-one interested heirs, including Raymond's three surviving siblings and the children of four siblings who predeceased Raymond. At issue are 187 acres of real property near the town of Castleton. The estate's co-administrators obtained a license to sell the property, and they held a private auction limited to family members. Appellant James Doran, one of Raymond's nephews, was the highest bidder. The probate court confirmed the bids, and Raymond's sister, Catherine Pellegrino, appealed this order to the superior court. Shortly thereafter, James assigned his interest in the property to a limited liability corporation, whose members included himself, his attorney in this case, Harry Ryan, and other nonfamily members. The superior court struck the probate orders, finding that James had acted in bad faith, and it remanded the case to the probate court. James appeals from this decision, and we affirm.

¶ 2. The record indicates the following. The property at issue was purchased by Raymond and his parents between 1917 and

1961. The superior court found that Raymond wanted to keep the property in the family, and that he had preserved the property for the family since the 1950s. Six of Raymond's heirs, including Catherine, own property adjacent to the estate's property. Following Raymond's death, Carl Scott and Joseph Doran were appointed as administrators of his estate. Joseph is Raymond's nephew, and Carl is married to one of Raymond's nieces. The administrators, specifically Carl Scott, sought input from the heirs as to how best to dispose of the property and sought to implement their wishes. Based on conversations with the heirs, the administrators determined that the growing consensus was to keep the property in the family and preserve it from development. Two heirs, each of whom held a small fractional share (1/72) of the estate, were interested in selling the property to the highest bidder, either within the family or outside of the family. The property was valued at $425,000 by a certified appraiser when treated as a single parcel, and the town assessed its value at $561,000. Ultimately, the administrators decided that some form of a sale of the property was best.

¶ 3. In September 2004, the administrators moved the probate court for a license to sell the property, indicating that the sale was necessary to provide a method of transferring the wealth of the estate equitably to each of the heirs. Following a January 2005 hearing, the court directed the administrators to develop a proposal for disposing of the real estate prior to the next scheduled hearing. In this order, the court noted that the heirs had concerns about whether the property should be sold as a whole or as four separate lots, whether development restrictions should be put on any sale of the property, and whether the appraisals accurately reflected the current value of the property. Given these issues, and the fact that some interested heirs had not been present at the January hearing, the court directed the administrators to consult with the heirs in developing their proposal for selling the property.

¶ 4. At a February 2005 probate hearing, two of the heirs, Catherine and Peter Doran, each offered to purchase the full parcel of real estate for $561,000 and $425,000, respectively. The administrators rejected Catherine's offer because she had indicated that she might sell parts of the property to a nonfamily member to defray the costs of acquiring and preserving certain land. Administrator Scott indicated his belief that the heirs

wanted to restrict any sale of the property to family members only, and the administrators did not want to upset that perceived consensus by allowing Catherine to purchase the property knowing that she might then sell off part of the property outside of the family.

¶ 5. Following the February hearing, the probate court issued a license to sell the real estate, and the administrators continued to develop a plan for the sale that would satisfy the heirs. During this time, Catherine's daughter, Mary, offered to purchase the property for $561,000 on behalf of a group of heirs that included Catherine and Ambrose Doran, one of Raymond's brothers. The administrators rejected this offer as well based on a desire to create an opportunity where multiple family members could own part of the property. The administrators finally decided to sell the property in four parcels, divided along the lines of the original four lots purchased by Raymond and his parents, in a private auction that would be open only to family members.

¶ 6. Thirteen family members attended the June 2005 auction, and James placed the winning bids on all four lots. The attorney for the estate then sent a purchase and sale agreement to James. James's attorney modified this agreement by adding new language and several contingencies. The attorney made the following modifications: changed the purchaser from James Doran to "Jim Doran his heirs or assigns"; inserted a clause making James's obligation under the agreement contingent on his receipt of any permitting necessary for his plans to use and develop the property; and added a mortgage contingency defined and limited only with the phrase "on terms acceptable to Purchaser." Administrator Joseph Doran, James Doran's brother, apparently signed this amended contract when James brought it to him, without either party commenting on the changes. Ultimately, however, the administrators decided that the new terms of contract were not acceptable.

¶ 7. In August 2005, James advised the probate court that he was unwilling to proceed with the purchase under the terms of the original purchase and sale agreement, but he would proceed if the contract drafted by his attorney was accepted. James also stated that he would not object to the second-highest bidders purchasing the lots on the same terms that had first been offered to him. Administrator Scott subsequently sent two purchase and sale agreements to the second-place bidders, and both contracts were returned, signed and with deposits. The probate court later

issued an order confirming James's bids, subject to an undefined financing contingency. The confirmation order made no mention of any second opportunity for the second-place bidders to buy the lots at the price offered by James, but it did state that the second-highest bids on each of the four lots were confirmed in the event that James did not purchase the lots. In mid-September, James informed the estate's attorney that he accepted the terms for sale as set forth by the probate court. Catherine then appealed to the superior court from the probate court's order confirming the sale.

¶ 8. The superior court conducted a de novo appeal. See Reporter's Notes, V.R.C.P. 72(d) (appeal from probate court is by trial de novo in superior court); *Whitton v. Scott*, 120 Vt. 452, 458, 144 A.2d 706, 709-10 (1958). In other words, the case was treated as if it had originated in superior court rather than probate court. Catherine identified the following questions on appeal:

> 1. Should the Administrators be permitted to sell all or any part of the Estate's real estate owned by the decedent at his death?

> 2. If any real estate is to be sold, how much and on what terms?

> 3. Should the interest and desires of a majority of the heirs-at-law have a bearing on the determination of what portion of the real estate should be sold?

¶ 9. After a two-day trial, at which administrator Scott, James, and Catherine's daughter, Mary, testified, the superior court answered all of the questions in the affirmative. The court concluded that the sale was allowed by statute, and that the administrators were entitled to sell "that part of the estate deemed necessary, either at public or private sale, as will be most beneficial to all parties concerned." 14 V.S.A. § 1651(6). It found that the heirs' desires should have a bearing on what portion of the real estate should be sold, and that both Raymond and the heirs wanted the property to remain in the family. In fact, the court explained, the administrators had given careful consideration to the individual interests and desires of the heirs, and arrived at an eminently fair and creative solution. The court concluded that the auction would have achieved the administrators' goal of satisfying the wishes of Raymond and the heirs but for the

undisclosed agenda of James, who had taken advantage of his family-member status to acquire the land privately so that he could turn around and sell it on the public market.

¶ 10. The court's conclusion regarding James's conduct was based on evidence presented for the first time during the de novo superior court trial. The undisputed evidence showed that shortly after Catherine filed her appeal in the superior court, James transferred his interest in the property to a Vermont limited liability company, Narod, LLC, which was to assume "[a]ll expenses of pursuing . . . real estate in the Raymond F. Doran Estate." James is a one-quarter member and owner of Narod. The remaining three owners share equally in the company, and they are not Doran family members. Two of the owners are Harry Ryan (James's attorney) and T.R. Ryan, whose family owns property abutting the Doran Farm Lot. The Ryans have long sought to move a road from the front of their family property onto a claimed right-of-way on Raymond's land. During the spring of 2005, the Ryans began to threaten legal action against Raymond's estate if the estate would not agree to a relocation of the road. The superior court found that James met with the Ryans in the spring of 2005 and discussed the right-of-way issue and potential lawsuit.

¶ 11. James testified that Narod was not formed until the fall of 2005, which was after James had successfully bid on the property at the June auction. While Narod may not have been formed until after the auction, the superior court's findings indicate that James and the other interested parties had already formed their business plan by the time the auction was held. Specifically, the court found that James bid at the auction in the interest of benefitting "himself and others outside the family for investment purposes," and that "the co-administrators and the members of the Doran family did not know that James Doran intended to purchase all four lots and convey them to a limited liability company." Thus, although the superior court made no findings as to exactly when James and the other members of Narod first began discussing the idea of joining forces to purchase the Raymond Doran estate property, it clearly concluded that those plans predated James's successful bids to purchase the property at the family-only auction.

¶ 12. Based on its findings — including those regarding the administrators' goals in creating the private-auction plan, the

administrators' decisions to turn down offers made by other family members prior to the auction, and the administrators' reasons for holding the family-only auction — the superior court concluded that James had a duty to tell the administrators and the family prior to the auction that he planned to develop the property with nonfamily members if he was the high bidder. The court also found that James took unfair advantage of the private-auction process, and that his actions violated the covenant of good faith and fair dealing. Accordingly, the superior court struck: (1) the probate order confirming the sale of the lots to James; (2) the license to sell the property that the probate court had issued; and (3) the administrators' motion for the license to sell. The superior court remanded the matter to the probate court with instructions that the administrators could begin anew if they still desired to sell any or all of the property. This appeal by James followed.

¶ 13. We begin with James's assertion that the court exceeded its authority under Vermont Rule of Civil Procedure 72.[1] According-ing to James, the superior court went beyond the questions raised by Catherine in reaching its conclusion. Specifically, he objects to the findings on which the court's decision is based, namely that he sabotaged the auction, acted in bad faith, and concealed his plan to develop the property with nonfamily members.

¶ 14. James interprets the scope of the superior court's authority far too narrowly. As previously noted, the appeal to the superior court is de novo. Given this, as well as the fact that no pleadings are required for the appeal, the statement of questions under Rule 72 serves to focus, but cannot limit, the issues for the court. While we have ruled that failure to submit a statement of questions is grounds for dismissal, *In re Estate of Seward*, 139 Vt. 623, 625, 433 A.2d 274, 275 (1981), we have never held that the court cannot address issues related to those submitted by an appellant. This would be wholly at odds with the broad authority given to superior courts to try probate cases anew. The court here was essentially asked to decide whether the heirs' desires had any bearing on the sale; having answered this question in the affir-

---

[1] We do not address James's suggestion that the court's order violates the rule against perpetuities or his statement (devoid of any claim of error) that the superior court denied Narod's motion to intervene. These contentions are not explained or supported by statutory or case law and so will not be considered here. *Johnson v. Johnson*, 158 Vt. 160, 164 n.*, 605 A.2d 857, 859 n.* (1992) (Supreme Court will not address inadequately briefed arguments).

mative, it is a logical corollary to consider if the intent of the administrators and the heirs had been accomplished. The evidence at trial addressed this question, and James's behavior was relevant to this issue. The court plainly had authority to make the findings it did. See *Whitton*, 120 Vt. at 457, 144 A.2d at 709 ("An appeal from a lower to a higher court carries up the whole case for a retrial upon all matters and features entering into and affecting the final decision and order to be made therein.").

¶ 15. James next posits that there was "no record" for the superior court to consider in reaching its conclusion. According to James, Catherine did not cause the probate court record to be transferred to superior court, thereby violating Rule 72(c). This argument is without merit. Rule 72(c) states that the "record on appeal shall consist of the papers and exhibits filed in the probate court" as well as the appellant's statement of questions and any transcripts furnished by the parties. One might presume that the papers and exhibits from the probate court are forwarded to the superior court in the same way that the trial court materials are forwarded to this Court when an appeal is filed. In any event, the proceedings before the superior court were de novo, and the parties presented extensive evidence at trial. James does not specify which parts of the papers or exhibits filed in the probate court were missing from the superior court's record, or how he suffered any harm from their alleged omission. We thus reject this claim of error.

¶ 16. Finally, James argues that the court erred in concluding that he thwarted the objectives of the auction, acted in bad faith, and intentionally misrepresented and concealed his plans for the property. James identifies no evidence contradicting the superior court's findings that he entered the auction intending to purchase the property for nonfamily members, and that he intended to develop the land. Instead, James asserts that there were no conditions placed on the sale of the property, and he argues that the private auction was conducted fairly and honestly.

¶ 17. While James disagrees with the court's findings, he fails to show they are clearly erroneous. See *Mullin v. Phelps*, 162 Vt. 250, 260, 647 A.2d 714, 720 (1994) (trial court's findings of fact will stand unless the appellant can show that there is no credible evidence to support them). The trial court considered the evidence cited by James, including the fact that there were no express

conditions at the auction. It was more persuaded, however, by the competing evidence. This evidence included: Raymond's intent; the administrators' intentions based on the apparent desires of the majority of heirs to keep the property within the family through private auction; the reasons underlying the administrators' rejections of previous offers made by other family members to buy the property; James's interactions with the Ryans; the formation of Narod; and James's transfer of his interest in the property to Narod. As we have often stated, it is for the fact-finder to assess the credibility of witnesses and to weigh the evidence, and we will not reweigh the evidence on appeal. *Id.* There was ample evidence presented to support the court's conclusion that James acted without disclosing his actual intention to bid in a private auction when he intended to put the property up to public sale. James's approach would entirely defeat the family's and the administrators' purpose in conducting a private auction.

¶ 18. Aware of his own plan to develop and offer the property for sale outside of the family, James failed to object, when invited to do so, to the private auction intended by the administrators to avoid the very result secretly intended by James. James was afforded this opportunity by the probate court, and his objection would have put the heirs and the administrators on notice that he preferred to settle the right-of-way action and to allow those outside the family to purchase and develop the property, presumably to maximize his return. Agreeable or not, the heirs and the administrators would then have appreciated that James's commercial objectives would compete with more sentimental motives. Understanding that James's bid could, in turn, lead to the property being developed and sold at large, the heirs and the administrators could then have reconsidered the private auction in favor of a sale not restricted to family so that all of them could benefit from the broader offering. Good faith required that he make known his objection and his intention to frustrate the purpose of the private auction.

¶ 19. Given its findings, the court acted within its discretion in granting equitable relief and rescinding the underlying probate court orders. See *Lariviere v. Larocque*, 105 Vt. 460, 466, 168 A. 559, 562 (1933) (trial court has discretion in deciding whether equity requires the cancellation or rescission of agreements, conveyances, and other instruments, and its discretion should be exercised according to what is reasonable and proper

under the circumstances of the particular case). The court found, and the record plainly shows, that James sought to defeat the plain purpose of the private nature of the sale for his own planned benefit at the expense of the other heirs. Had this been a public auction, one might reach a different conclusion. But James attended the private auction and took unfair advantage of the proceeding. Indeed, Catherine was denied the same opportunity to purchase this property provided to James solely on the basis that she might sell a portion of the property to nonfamily members. This was unfair. Given this, and the other circumstances presented here, there is "no injustice that will be done, by placing [the] parties in the positions they occupied before the contract or conveyance was made."[2] *Id.*; *Ring v. Windsor County Mut. Fire Ins. Co.*, 54 Vt. 434, 436 (1880) ("What ought to have been done is considered in equity as done." (quotation omitted)). The court properly ordered the parties to return to the status quo that existed before the sale. With all of the facts on the table, the parties may advocate, and the administrators and probate court can now decide, how best to proceed either by "public or private sale, as will be most beneficial to *all* parties concerned." 14 V.S.A. § 1651(6) (emphasis added).[3]

*Affirmed.*

¶ 20. **Reiber, C.J.,** dissenting. Today the majority affirms a superior court ruling that was based solely on a finding that James Doran violated the covenant of good faith and fair dealing when he outbid his fellow heirs and then made plans to develop the land for investment purposes rather than keeping it in the

---

[2] We reach this conclusion in part because there has been no sale of the property to a bona fide third-party purchaser. This is an important factor in determining whether it would be unjust to return the parties to the status quo. Cf. *post,* ¶ 36.

[3] The dissent expresses its concern that the trial court imposed restrictions on the future development of this property, but we find nothing in the trial court decision to support this contention. We do not read the decision to "creat[e] . . . an undefined estate in land" by operation of law and without written formalities. *Post,* ¶ 27. Such limitations on a future conveyance could well raise the problems outlined by the dissent, and we do not remand for imposition of any such encumbrances. The trial court's decision simply returned the parties to the position they were in before the auction, and we have affirmed that decision. As the trial court held, "[i]n the event the co-administrators wish to file another motion to sell all or a portion of the real estate, they may begin anew."

family. I disagree and would reverse the decision of the superior court.

¶ 21. James placed the highest bids on all four of the properties at issue. He bid a total of $741,000 — an amount far in excess of the town assessment of $561,000 and the independent appraisal of $425,000. As the highest bidder, James offered a larger dollar payment to each heir than was available through a sale to any other family member. Even assuming that James was intentionally hiding his future intentions from others when he made his bids, his actions were well within his legal rights. Because there were no written limitations on alienation in the license to sell that was issued by the court without objection from any interested party, James's attempt to assign his interest in the property after winning the auction was proper as a matter of law. Although our law imposes upon administrators a fiduciary duty to the intestate's heirs, that duty must be more narrowly defined than the superior court defined it, or every probate proceeding will be open to collateral attack based on some heirs' views of the intestate's unexpressed wishes.

¶ 22. The principal difficulty with the majority's holding is that it forces administrators to attempt to divine the wishes of the heirs — wishes which may be quite diverse — rather than fulfilling their duty to obtain the maximum amount reasonably obtainable for the property. It is fundamental to orderly probate administration that an administrator's duty to the heirs, when there is no will indicating otherwise and a sale has been ordered, is to obtain the highest price possible for the property in question. See, e.g., *Feldman v. Feldman*, 198 A.2d 257, 258-59 (Md. 1964); *Onanian v. Leggat*, 317 N.E.2d 823, 827 (Mass. App. Ct. 1974); *Desloge v. Tucker*, 94 S.W. 283, 287-88 (Mo. 1906); *Estate of Kane*, 470 N.Y.S.2d 823, 825 (App. Div. 1983); *Dombey v. Rindsfoos*, 151 N.E.2d 563, 580 (Ohio Ct. App. 1958).[4] In *Dombey*, for instance, the court concluded that in that case the fiduciary's acceptance of

---

[4] While many of the cases cited here involve trustees and executors, rather than administrators of intestate estates, and there are certainly differences between the fiduciary responsibilities of persons in these various positions, those differences are not material on the facts before us today. See *Hall v. Schoenwetter*, 686 A.2d 980, 983 (Conn. 1996) ("Although executors and administrators are not trustees, they 'occupy a position in many respects analogous . . . and many of the rules determining the powers and duties of trustees apply to them.' " (quoting *Hall v. Meriden Trust & Safe Deposit Co.*, 130 A. 157, 161 (Conn. 1925)).

an offer for sale that was less than "the highest price obtainable" was not in the best interests of the estate. 151 N.E.2d at 580. Similarly, in *Desloge*, the court refused to affirm a sale where the administrator sold estate land for $10,000 less than the highest offer. 94 S.W. at 287. The *Desloge* court noted that because of the lower purchase price, "[t]he real estate was unnecessarily sacrificed, and that is judicial reason enough to refuse to confirm" the sale. *Id.* at 288. The court further noted, with respect to the putative purchaser and the administrator, that their subjective desires or "feelings . . . entirely miss the heart of the issue," which was simply to provide the heirs with as great a surplus as possible upon the sale. *Id.* at 287-88. As in *Desloge* and similar cases, the administrators' duty here was to obtain the highest price reasonably obtainable for the property.

¶ 23. A duty to ascertain and harmonize the wishes of the heirs, of course, is considerably more difficult to define or fulfill. Here, decedent left more than twenty heirs, and they had varying views on how best to dispose of the property. At least two of those heirs expressed a desire that the administrator simply sell the property on the open market for maximum value. Some others, including Mary Pellegrino, believed that decedent wanted the property (or at least the original farm parcel) to remain in the family. In an attempt to decide upon the optimal disposition of the real property, the administrators sent a letter to the heirs laying out several different possibilities:

1. Sell the farm to a commercial developer (highest bidder).

2. Sell the farm to a non-profit land conservation group such as the Vermont Nature Conservancy that will preserve the current look of the farm and land.

3. Sell the farm with certain development or use restrictions.

4. Sell the farm to [a] family member with or without deeded restrictions.

5. Form a corporation of family members to manage the farm, timber and quarries (with or without restrictions).

6. Sub-divide the land into 22 pieces and give each family member their pro rata share of land (with or without restrictions).

7. Sub-divide the land along the historical boundary lines to create up to 4 parcels and deal with each parcel separately.

¶ 24. Some months later, the administrators filed a motion for a license to sell the real estate, making no mention in the motion of any restrictions as to initial purchase, subsequent alienation, or development. Notice of a hearing was sent to all of the heirs. After the first hearing in October 2004, a second hearing was held in January 2005 to "revisit" the license issue. The memorandum to the heirs announcing the second hearing reflected a determination that the property would be offered for private sale to the "Interested Parties" rather than by public sale. At the second hearing, the probate court found, several "issues" were raised "by various family members," including, essentially, options three and seven from the list above. In light of these considerations, and because several interested parties did not attend the first hearing, the probate court ordered the administrators to convene a third hearing, on February 28, 2005. The court noted that "[a]ny family member who has an objection to the proposed sale presented by the Administrators should be prepared to attend the [February 28] hearing and present evidence on their objections." We are not aware of any objections being raised at the February 28 hearing, and if they were raised they were not incorporated into the order that the probate court issued the following day — an order to which no recorded objection was made by any party in either the probate court or the superior court.

¶ 25. On March 1, 2005, the probate court found that the sale of the real estate was necessary to "provide equitable transfer of assets to the numerous heirs of this estate" and accordingly granted the administrators a license to "sell the real estate either at public auction or private sale." See 14 V.S.A. §§ 1613, 1651(6). The license imposed no limitation on who could purchase the real estate or what could be done with it after purchase. It made no reference to the administrators' earlier letter to the heirs and did not impose any of the seven possible methods of limitation that had been described in that letter.

¶ 26. The lack of express limitations encumbering the property is not surprising; not all of the heirs wished to encumber the

property by forcing the purchaser to keep it forevermore within the family. In addition to those heirs who wished to sell the property on the open market for maximum value, even some of those who expressed a desire to keep the property in the family took actions that implied that they did not wish any permanent encumbrances to be placed on the property. For instance, after the probate court authorized a sale, Mary Pellegrino sent a letter to the administrators and the probate judge offering to purchase the entire property for $561,000 "free of encumbrances." The administrators did not accept the offer. Instead, the administrators sent all of the heirs a notice that they would all be given an opportunity to bid on the property in four separate parcels at a private auction. That notice, however, also expressed no limit on the prospective buyers' ability to transfer or encumber the property after purchase. At the auction, no statements were made about any such limitation. As mentioned, James placed the high bids on all four parcels, and his total bid of $741,000 was far in excess of the town assessment of $561,000 and the independent appraisal of $425,000. The appraisal and the town assessment, of course, were both premised on a property free of encumbrances, as was Mary Pellegrino's original bid, which explicitly contemplated a property wholly "free of encumbrances."

¶ 27. James's winning bids were approved by the probate court, which found that the auction had been conducted fairly and openly and that the administrators had fulfilled their duty to obtain fair market value for the property. On appeal, the superior court concluded that the sale at auction had been subject to an unexpressed limitation: that the property could not be transferred out of the family. This raises yet another problem with affirming the superior court's opinion: the creation of an undefined estate in land, apparently by operation of law and without written formalities. Cf. 27 V.S.A. § 302 ("An estate or interest in lands shall not be assigned, granted or surrendered unless by operation of law or by a writing signed by the grantor or his attorney."). The administrators had no power to encumber the real estate in this manner. Even if they had possessed such power, it was plainly not exercised in this case, and the superior court should not have relied upon an unwritten encumbrance as a basis for nullifying the sale to James.

¶ 28. The superior court's ruling and today's majority opinion fail to recognize that the administrator with a general license to

sell has no power to do anything other than sell, without encumbrances, the real estate subject to the license. We so held in *Brown v. Van Duzee*, 44 Vt. 529, 533 (1872). In *Van Duzee*, the executor of a will had authority pursuant to a license to sell $1442.89 worth of real estate to meet the debts of the estate. Instead of simply conveying sufficient real estate to pay the debt, however, the executor sold part of the estate and in connection with it "undertook to convey a privilege of a foot-pass" over other lands of the estate. *Id.* The Court noted that the license "was an authority given by the law as administered by the probate court, and had no force except that which the law through the action of that court gave it." *Id.* The Court held that the word "sell" in the license was "the operative word" and "imports that the whole title to any estate disposed of is to be parted with for an equivalent in money, and not that such estate is to be [e]ncumbered for money." *Id.* This was so in part because the deed conveyed by an executor at a licensed sale is presumed to be as good as that which might have been conveyed by the decedent before death. *Id.* at 533-34; see also *Thrall v. Spear*, 63 Vt. 266, 270-71, 22 A. 414, 415 (1891) ("[P]ower given by a license from the Probate Court to sell real estate . . . give[s] no right to encumber such property.").

¶ 29. Here, of course, the administrators did not expressly encumber the property through a written instrument. Rather, after the sale, and without written formalities, the superior court sought to ensure that whoever purchased the property at private sale would not later transfer it outside the family. This amounts to the same sort of encumbrance that was rejected in *Van Duzee* and *Thrall*, with the added difficulty that the scope of the encumbrance here is entirely uncertain. It is unclear precisely who will have the right in the future to enforce the limitation on alienation, how long that right will last, and what the remedy might be for its violation. These difficulties highlight the sound reasons for imposing on administrators and trustees the plain duty of selling unencumbered real estate for the highest price reasonably obtainable, and not a duty to encumber property in the service of the heirs' or administrators' sentimental wishes.

¶ 30. It is a matter of black-letter law that the administrators' duty was to "act in a *prudent and business-like manner*, with a view to obtain as large a price as might, with due diligence and attention, be fairly and reasonably obtainable under the circumstances." *Gould v. Chappell*, 42 Md. 466, 470 (1875); see also

*supra*, ¶ 22, and cases cited therein. The duty is an affirmative one, and "if the trustees fail in reasonable diligence in inviting competition, or adopt an injudicious and disadvantageous mode of selling the property, a [court] ought not to ratify the sale." *Gould*, 42 Md. at 470. Indeed, in recognition of the importance of administrators following through on their duty to seek the maximum amount obtainable in a sale of the decedent's real estate, some states provide administrators with a sales commission. See, e.g., Ohio Rev. Code Ann. § 2113.35. The policy behind such a statute is to ensure that all heirs receive the maximum benefit possible — the same policy that drives 14 V.S.A. § 1651(6), which instructs the probate court to authorize whatever type of sale will be most beneficial to all concerned parties. The superior court's opinion, upheld by the majority today, discourages competition and is likely to result in sales for much less than is reasonably obtainable under the circumstances.

¶ 31. Had Raymond Doran wanted to sell his real estate at private auction before his death, he would have had the power to do so. He would also have had the power to impose upon the parcels sold the requirements that they not be resold except to named family members, that they not be developed, and the like. But his power to do these things could only have been exercised with written formalities, not by sitting silently by until a buyer attempted to resell the property and only then challenging the sale as contrary to his unexpressed wishes.[5] If even decedent himself could not silently encumber the property, then neither could his administrators.

¶ 32. The superior court's decision amounted to a holding that an intestate decedent's unmemorialized wishes, evidenced only by the self-serving testimony of some of his heirs, can impose unspecified but apparently durable restrictions on the alienation and use of real property. The superior court's remand so that the administrators could "begin anew" begs far more questions than it

---

[5] Indeed, at least one court has held that even written instructions must be explicit before they can authorize administrators to stray from acting in a business-like manner at all times. See *Musselwhite v. Ricks*, 189 S.E. 597, 600 (Ga. Ct. App. 1936) (holding that when a will directed an administrator to collect debts "in the manner as near as practical" as the testator collected debts, and where it was "claimed that the testator had been very lenient in collecting the amounts due to him by his children," the administrators still had a duty to be diligent in collecting debts from the testator's children, so as to ensure that all of the heirs received their fair share of the estate).

answers and can only result in further litigation. Among other things, we are left to wonder: (1) how will the administrators determine whether a future prospective purchaser intends to sell the property once it is purchased; (2) if the administrators do somehow determine that a purchaser intends to use the property in a way that they think decedent would have disapproved of, how will the administrators prevent that use; (3) if the administrators truly intend to impose on the property the limitation that no person outside the family can *ever* purchase it, who will police that limitation and how; and (4) assuming that such a limitation were enforceable in perpetuity, would not the asking price have to be drastically lowered, to the detriment of the value of the estate and in contravention of the administrators' duty to the heirs?

¶ 33. The majority endorses the superior court's attempt to divine the intent of decedent and "the administrators' intentions based on the apparent desires of the majority of heirs to keep the property within the family through private auction." *Ante,* ¶ 17. The majority characterizes the superior court's actions here as pure fact-finding involving nothing more than the traditional weighing of evidence that lies within the expertise of trial courts. *Id.* But the majority ignores the underlying legal principle that prevents trial courts from engaging in this type of exercise in the first place: restrictions on the alienation of property should be achieved, not by after-the-fact guesswork, but by formal written instruments, such as wills, covenants, and limited licenses to sell. As detailed above, no such formalities were created with respect to the property at issue here. Although there were clearly discussions about the *possibility* of imposing various conditions on the sale, including deed restrictions, the administrators ultimately did not impose any. The superior court erred in concluding that written formalities could be dispensed with in the name of equity. The court's conclusion was premised on a legal error that reduces probate administration to a swearing contest. We should not endorse such a process.

¶ 34. For these reasons, I would reverse the superior court's decision and remand for entry of judgment in favor of James Doran. I am authorized to state that Justice Dooley joins in this dissent.

¶ 35. **Dooley, J.,** dissenting. I join the dissent of Chief Justice Reiber. To me, this is a classic case where the common tension between doing justice for the individuals before the court, and

developing and applying a sound rule of law, is resolved in a way that gives far too little weight to the need for predictable, ascertainable and fair legal principles. Essentially, the theory of the majority is that equity can do anything as long as it is "reasonable and proper under the circumstances of the particular case." *Ante*, ¶ 19. In *Lariviere v. Larocque*, 105 Vt. 460, 466, 168 A. 559, 562 (1933), the case relied upon by the majority, this language was used in a traditional area of equity jurisdiction — rescission of a deed based on a mutual mistake of fact — to make clear that even if a mutual mistake is found, the chancellor has discretion in determining what remedy to impose. Here, it is being used to intervene into a wholly statutory procedure — not in an area of traditional equity jurisdiction, and to create a new and amorphous rule of law with no discernible limits, not just a remedy for a clear wrong.

¶ 36. Like Chief Justice Reiber, I am very concerned about the effect of this decision on the validity of title conveyed under a license to sell. If James had managed to hide his plan to resell until after title passed to him, or he had developed the plan to resell only after title passed, the result would be the same and some of the other heirs would likely be unhappy enough to litigate, as they did here. The majority's rationale of fairness and justice would apply equally to that situation, and as the majority says, the effect would be to return "the parties to the position they were in before the auction." *Ante*, ¶ 19 n.3. By that time, others may have relied upon the valid deed to their detriment.

¶ 37. I appreciate the response by the majority that the result might be different if the issue were whether to protect the interests of a bona fide purchaser from James. *Ante*, ¶ 19 n.2. But persons, government agencies, and others rely upon record title in myriad ways, and our policy should be to avoid hidden limitations on title whenever possible.

¶ 38. The short and sweet answer to James's actions is that the other heirs should have sought a limitation on the license to sell that prevented resale, or defined the conditions under which it would be allowed. In the absence of such a limitation, there is no ground to interfere with a bona fide sale under the license. I am authorized to state that Chief Justice Reiber joins in this dissent.