Kahl v. Schober.

KATHARINA KAHL, appellant,

v.

FREDERICK SCHOBER, executor &c., respondent.

1. Habits of drunkenness do not, of themselves, take away testamentary capacity, although such habits produced the disease of which testator died a few weeks after making his will.

2. It is not enough to deny probate to a will, that it does not appear affirmatively that it was read over to or by the testator before he executed it where it does not also appear that it was *not* read over to or by him then, and it further appears that he was then capable of reading it, and fully understood its contents, which were in accordance with his instructions, and there is no proof of fraud or imposition.

Appeal from decree of Hudson orphans court, admitting to probate a paper writing purporting to be a codicil to the last will and testament of Julius G. Kahl, deceased, and ordering the caveatrix to pay the costs.

*Mr. R. B. Seymour*, for appellant.

*Mr. J. Garrick*, for respondent.

THE ORDINARY.

Julius G. Kahl, then of Jersey City, died there August 19th, 1880. He made his will on the 3d of March in that year, and a codicil thereto on the 24th of July following. The surrogate of Hudson county admitted both instruments to probate in September, 1880. From his proceedings the appellant, the widow,

appealed to the orphans court of that county, by which the pro-
ceedings were affirmed, and she was ordered to pay the costs.
From the decree of that court, so far as the admission of the
codicil to probate and the order for the payment of the costs are
concerned, the appellant appealed to this court.    The grounds
of the appeal to the orphans court were incapacity and undue
influence.    From the decree admitting the will to probate,
although the will was contested there, there is no appeal.    It
will therefore be assumed that the testator, at the time when the
will was made, March 3d, was possessed of testamentary capac-
ity, and that there was no fraud in the making or obtaining of
that instrument.    And, indeed, the proof fully warrants such
assumption and conclusion.    Between the date of the will and
that of the codicil, was a period of a little less than four months.
The codicil exhibits but little change in the intention of the tes-
tator.    On the other hand, it was designed to effectuate his in-
tention in the disposition of his property, which he meant to
secure by his will.

   The will, after directing payment of debts, gives to his son
Charles $700, to be in full of all claims by him for services
rendered to the testator.    He had served his father in the busi-
ness of the latter for many years, and had received no compen-
sation, except his board and clothing, and the testator intended
to pay him by that legacy.    The testator then gives his house-
hold furniture to his wife, and directs his executors to sell and
dispose of all the remainder of his personal estate and convert
it into money, and, after paying his debts and the legacy to
Charles, to divide the remainder into three equal parts, and pay
one of them to his wife, one to Charles, and the other to his
daughter Henrietta.    He had only those two children.    He then
provides for the sale of his business to Charles (if he should
not have disposed of it before his death), if Charles should wish
to buy it, and provided, also, that if Charles shall purchase it
he shall not be required to pay cash for it, but shall be charged
with the amount on account of his legacy.    He then gives all
his real estate to his executors in trust, to collect all the rents
and revenues thereof until they shall sell it, and out of the rents

to pay the taxes, water-rents, assessments, repairs, insurance and other necessary expenses thereon, and pay over the residue to his wife and children in equal shares. He provides that if his wife and Charles, or either of them, desire to occupy and shall occupy, any part of his real estate, they shall be permitted to do so at a fair rent, which is to be deducted from their respective shares of the income of his real estate; that if his daughter, during her minority, resides with her mother, the latter is to be fairly compensated for her maintenance, and he also provides that his executors shall sell his real estate when his daughter attains her majority (but may, at their discretion, do so before that time, provided it be after she shall have arrived at the age of eighteen years), and divide the proceeds equally between his wife and children. He appoints his executors, and the survivor of them, guardians of his daughter, directing that they invest her share of the personal estate, and of the income of the real estate, after paying for her support, and her share of the proceeds of the sale of the real estate, on first bond and mortgage of real estate worth double the amount invested, and transfer the investment to her with any income on hand, on her attaining to her majority. Finally he constitutes Frederick Schober and John Stratford (now deceased), of Jersey City, executors of his will, relieving them from the necessity of giving bonds as executors, trustees or guardians under the will, unless required to do so by some competent tribunal for special cause shown. By the codicil he directs that the legacy of $700 shall not be paid to Charles until his daughter shall have attained to the age of eighteen years, unless she shall die before that time; and he directs that any money recovered from his life insurance in the masonic fraternity, to which he belonged, shall be considered part of his personal estate, and shall be applied and disposed of as his personal estate is directed to be applied and disposed of, and that if on account of any rule or order of the society it shall be paid to his wife, the amount shall be deducted from her share of his estate. The will was drawn by Mr. Garrick, at his office in Jersey City, on the instructions of the testator, who came to him there for the purpose, and it was exe-

cuted there. The witnesses were Messrs. Garrick, Traphagen and Wright, all of whom testify on the subject of the execution. The codicil was drawn at the testator's house. He was then confined to his bed. He appears to have sent by Mr. Stratford, one of his executors, for Mr. Garrick to come to see him to make an alteration in his will. Mr. Garrick went, and found him in his room. His son was also there. The testator requested his son to leave the room, and, when he had done so, caused the door to be locked, to secure privacy until he should have finished the business on which he was about entering. When he and Mr. Garrick were there alone he informed the latter what changes he wanted to make in his testamentary disposition of his property. Mr. Garrick testifies on that subject as follows:

"He told me he wished to make a change in his will, and I did so; he wanted it expressed in the will that the legacy to his son should not be paid until his daughter should be eighteen years of age, and he also said that he had his life insured in the masonic order, and he did not know whether the will would cover that life insurance, and wanted it so fixed that the life insurance should be equally divided between his wife and his son and daughter; I asked him whether the insurance was payable to his executors or administrators, or whether it was payable to his widow in case he should die; he told me that he did not know; I told him that if it was payable to his widow he had no power to dispose of it by will; he then said if it is payable to her, and she gets it, then I want the amount deducted from her share of the estate, I then drew the codicil in accordance with his directions; he was very feeble in body, but his mind appeared to be perfectly clear; I knew nothing about this life insurance, except what he told me; when I called at the house he expressed the wish that he and I should be alone in the room, and directed me to lock the door, which I did."

After Mr. Garrick had drawn the codicil, he told the testator that it would be necessary to have another person besides himself for a witness, and thereupon the testator called in his son and told him to go out and get some neighbor who could write his name, to come in. The son obeyed, and brought in Mr. Rosenow, who, with Mr. Garrick, witnessed the instrument. Mr. Rosenow says he saw the testator make his mark (he was too weak to write) before he signed as a witness, and he heard him

Kahl v. Schober.

say both before and after he signed the paper that it was a codicil to his last will and testament. He further says that the testator himself asked him to sign his name as a witness, and he adds that he believes he understood him to say that he had requested Mr. Garrick to do so. Both the will and the codicil were executed with all due legal formalities. There is not only nothing in them to excite suspicion as to the testamentary capacity of the testator, but on the other hand they bear witness to his competency. Not only do the testamentary witnesses testify to his capacity when the codicil was executed, but his physicians, Drs. Youlin and Fuller, also testify to his competency. The former attended him for eleven days in April, 1880, and again every day from June 19th to July 3d in that year, when he introduced Dr. Fuller, who attended him from the last-named day until August 19th, 1880, the day of his death. Dr. Fuller made fifty visits to him. He attended him nearly every day and sometimes more than once on the same day; and Dr. Youlin, after he introduced Dr. Fuller, visited the testator professionally on the 7th, 14th and 21st days of July. It will be seen that the testator lived for three weeks after he made the codicil. There are also other witnesses who testify to his competency. The appellant herself and her witnesses testify to irrational conduct on the part of the testator at times, but that conduct was undoubtedly the result of his indulgence in intoxicating drink, which appears to have been the cause of the disease of which he died. It is familiar law that habits of drunkenness do not of themselves take away a man's capacity to make a will. The testator was not intoxicated when he made the codicil. The caveatrix, it may be remarked, herself thought him competent at the time; for immediately after the codicil had been executed she complained that she had been excluded from the room when it was made, and in conversation with the testator on the subject she said to him that he might have let her know what he was doing, since it would have made no difference, seeing that he was at liberty to do what he pleased, whether it was satisfactory to her or not.

It is urged, however, that the codicil ought to be denied pro-

bate on another ground, viz., because it does not appear that it was read over to the testator, or that he himself read it. But while that is true, it does not, on the other hand, appear that it was not read over to or by him. No inquiry on the subject was made of Mr. Garrick, and from the evidence there can be no doubt that the testator was able to read it, and that he fully understood its contents, and that is enough, although he may not have read it or heard it read. If, said Judge Washington, in *Harrison* v. *Rowan, 3 Wash. C. C. 580, 585,* evidence be given that the testator was blind or from any cause incapable of reading, or if a reasonable ground is laid for believing that the will was not read over to him, or that there was fraud or imposition of any kind practiced on him, it is incumbent on those who would support the will to meet such proof by evidence, and to satisfy the jury either that the will was read, or that the contents were known by him. In *Day* v. *Day, 2 Gr. Ch. 549, 555,* the ordinary (Chancellor Vroom) said on this subject that if the will can be shown to be substantially in accordance with the instructions of the testator, it may be considered sufficient evidence that he was acquainted with its contents, though he did not read it, and it was not read over to him. In the case before me, Mr. Garrick testifies that he drew the codicil in accordance with the testator's directions which he details. Mr. Rosenow, the other witness to the codicil, says that the testator, before he made his mark, " explained " to him. What he means by that expression does not appear clearly. He may mean that the testator informed him what the contents of the paper were. But however that may be, John Ferguson, who was an old and intimate friend of the testator, and who frequently visited him, testifies that within half an hour after the codicil was executed the testator told him about it, and mentioned the life insurance as a thing he had forgotten when he made the will, and said that he wanted that money divided into three parts, the same as his other property, and that he had got the lawyer who drew his will to make the alteration. There was no fraud or imposition on the testator when he made the codicil, nor is there any imputation of either; and there is no reason even to suppose that the

codicil was not read over to him. There is no room to doubt
that he was possessed of full testamentary capacity, and no proof
is offered on the subject of undue influence. He appears not
only to have been free to act, but to have secured himself, by
excluding his wife and son from the room and locking the door,
from even any intrusion while he was engaged in the testament-
ary act. The decree appealed from will be affirmed, and the
appellant will be decreed to pay the costs of the appeal.