# In re Estate of George M. Burt

[ 169 A.2d 32 ]

January Term, 1961

Present: Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.

Opinion Filed March 1, 1961

*Abatiell & Radigan* for the contestant.

*Manfred W. Ehrich, Jr.* and *John H. Williams, II,* for the proponent.

**Shangraw, J.** This is an action respecting the last will and testament of George M. Burt, late of Arlington, Vermont, deceased. The will was allowed by the Probate Court for the District of Manchester. The contestant, William H. Burt, appealed to the Bennington County Court and a trial was had by jury which resulted in a verdict allowing the instrument, and judgment was entered thereon. The contestant is the sole surviving brother of the deceased. The proponent, Harold J. Blair was named beneficiary in the will, and, under the terms thereof, received the entire estate. The case is here on appeal by the contestant on three assignments of error.

The decedent was a life-long resident of Arlington, Vermont, and suddenly died during the year 1959 as a result of an accident. He was about seventy-two years old at the time of his decease. During February of the year 1958 he consulted with Manfred W. Ehrich, an attorney with offices in Bennington and Arlington, concerning the preparation of a will. Mr. Ehrich's Arlington office is located in his residence. On March 12, 1958, at the request of the testator, Harold J. Blair, the named beneficiary, and John Walsh, a neighbor, went in Mr. Blair's automobile with the testator to Mr. Ehrich's Arlington office. The deceased had no car. While at the office the will was read

to the testator by Mr. Ehrich and signed by the testator. The deceased was unable to read but could and did sign his name. The subscribing witnesses were Mrs. Ehrich, Mr. Ehrich, and Mr. Walsh. Mr. Blair was present at the time and stayed in the office at the request of the testator. Mr. Ehrich was paid by the testator for his services. The original was left with Mr. Ehrich and remained in his possession until filed for probate. A copy of the will was given to the testator. Proper execution of this instrument is not questioned.

In the preparation of the will Mr. Ehrich was told by the testator that he did not desire that his brother William (mentioned in the will as Wilbur), born in 1874, to receive any part of the estate,—not "a rusty nail." Witnesses testified that at the time of the execution of the will the testator was alert, sober, and normal. Further, that he listened carefully while the will was being read, definitely knew what he was doing, and was of sound mind. These facts, concerning his testamentary capacity, were not disputed. The estate consists of bank deposits of about $6,000 together with the Burt homestead occupied by the deceased at the time of his death, and formerly owned and occupied by his parents.

The pertinent provisions in the will read:

"First: I give, devise and bequeath my entire net estate both real and personal, of whatsoever kind, nature and description and wheresoever situate to HAROLD J. BLAIR, of Arlington, Vermont.

"In the event that HAROLD J. BLAIR shall predecease me, I direct that my estate be distributed among such persons and in such proportions as shall at that time be prescribed by the laws of descent of the State of Vermont.

"Second: I am not unmindful of my brother WILBUR BURT, but I leave nothing to him because I feel that he is otherwise adequately provided for and that my legatee and devisee herein named has a better claim upon my generosity."

The contestant's first assignment of error is to the action of the trial court, on motion made by the proponent, withdrawing from the jury's consideration the question of testamentary capacity and directing a verdict in favor of the proponent on this issue. The contestant urges that the evidence presented a jury question on this issue. In considering the questions raised as to the action of the court in

directing a verdict for the proponent on this issue, the evidence must be taken in the light most favorable to the contestant. *In re Collins Will,* 114 Vt. 523, 525, 49 A.2d 111.

The proponent's motion for a directed verdict on the issue of testamentary capacity presents the question of whether the evidence raised a factual issue requiring its submission to the jury. This leads us to the question as to what are the necessary essentials to constitute "testamentary capacity." A testator who has a sound mind and disposing memory is one who has a full and intelligent knowledge of the act in which he is engaged, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires to be the recipients of his bounty. *Converse v. Converse,* 21 Vt. 168, 169, 170; *In re Otto's Estate,* 349 Pa. 205, 36 A.2d 797. In the determination of testamentary capacity, the true test is whether the testator had sufficient mind and memory at the time of making the will to remember who were the natural objects of his bounty, recall to mind his property, and dispose of it understandingly according to some plan formed in his mind. *In re Chongas' Estate,* 115 Utah 95, 202 P.2d 711, 712; *In re Johnsen's Estate,* 149 Nev. 34, 30 N.W.2d 70, 72.

The contestant claims lack of testamentary capacity on the part of the testator relying upon evidence to the effect that the testator was temperamental, a heavy drinker, illiterate, unneighborly, and abusive to his father and sister Sarah. A review of the transcript discloses that there is some evidence of these characteristics, habits, and actions on the part of the testator. Without burdening this opinion with the details it is sufficient to say that eccentricities amounting to no more than slight peculiarities do not establish lack of testamentary capacity. *Perkins' Guardian v. Bell,* 294 Ky. 767, 172 S.W.2d 617. While the testator drank to excess on occasions, no evidence was introduced to the effect that his mind or health had been impaired by the use of intoxicants. Habits of drunkenness do not of themselves take away a man's capacity to make a will, where the testator is not intoxicated when the will is made. *Kahl v. Schober,* 35 N.J. Eq. 461. *Olshefski's Estate,* 337 Pa. 420, 11 A.2d 487, 488. See annotation, 67 A.L.R. p. 859. An illiterate person may have testamentary capaci-

ty. *Jones* v. *Denton,* 192 Okl. 234, 135 P.2d 53, 56. Testamentary capacity is not based on education. Persons who can neither read nor write, if they are otherwise qualified mentally, have the same right and power to make a will as the most thoroughly educated persons. *In re Rawlings,* 170 N.C. 58, 86 S.E. 794. The testator withheld speaking to a neighbor for two years by reason of the fact that he claimed the neighbor's dog was eating his eggs. We think it may be said that neighbors are on occasions not neighborly for a less reason than this. While the testator, on occasions, evidenced a mean or bad disposition towards members of his family, a violent temper does not destroy a man's capacity to make a will. *Prentis* v. *Bates,* 93 Mich. 234, 53 N.W. 153, 17 L.R.A. 494. A thoroughly bad man may make a valid will. *Snell* v. *Weldon,* 239 Ill. 279, 87 N.E. 1022; *Boardman* v. *Woodman,* 47 N. H. 120. To summarize, there was no evidence from which the jury could find that the above characteristics, habits, and actions of the testator in any way impaired his ability to make and understand the import and effect of his will. On the evidence in this case, in that fair-minded men could not honestly differ as to the conclusion to be drawn from the evidence, it became the duty of the court to pass upon the testamentary capacity of the deceased as a matter of law and to direct the jury accordingly. *Spaulding* v. *Mutual Life Ins. Co. of N. Y.,* 94 Vt. 42, 55, 56, 109 A. 22; *Dashnow* v. *Myers,* 121 Vt. 273, 278, 155 A.2d 859. No error appears in the granting of the proponent's motion on this issue.

Next, the contestant claims that the court erred in not directing a verdict in his favor on the ground of undue influence. This motion, to a large extent, was based on the "suspicious circumstances" rule stated in *In re Barney's Will,* 70 Vt. 352, 40 A. 1027. Contestant urges that the close friendship which existed between Harold J. Blair, beneficiary, and the testator constituted a confidential relationship, and that there was cast upon the proponent the burden of proving that the will was not procured by undue influence on the part of Mr. Blair, which contestant claims the proponent failed to do.

In order to avoid a will on the ground of undue influence, the influence must be such as to destroy the free agency of the testator at the time and in the very act of making the instrument. *In re Everett's Will,* 105 Vt. 291, 301, 166 A. 827, 830; *Smith's Exr.* v. *Smith,* 67 Vt. 443, 445, 32 A. 255; *Foster's Exrs.* v. *Dickerson,* 64

Vt. 233, 243, 24 A. 253. Direct evidence of undue influence is not necessary. It may be shown by circumstances which have a legitimate tendency to prove that it was used. *In re Everett's Will, supra,* at 315.

Having in mind the asserted claim of the contestant that a confidential relationship existed between the testator and Mr. Blair, and the burden of proof in such cases, we quote from *In re Collins Will,* 114 Vt. 523, 49 A.2d 111. At page 533 this Court said: "The burden of proving the existence of undue influence is, ordinarily, upon the contestant. But when the circumstances connected with the execution of the will are such as the law regards with suspicion, the burden is shifted to the proponent, who must show affirmatively that the will was not procured by this means." * * * "Generally speaking, the doctrine is applicable where a relationship of trust and confidence obtains between the testator and the beneficiary, or where the latter has gained an influence of ascendency over the former. Usually, but not always, it appears that the beneficiary has procured the will to be made or has advised as to its provisions." *In re Moxley's Will,* 103 Vt. 100, 112, 152 A. 713, and cases cited.

The factual situation on the issue of undue influence appears as follows: The testator's animosity toward his older brother William, the contestant, is clearly apparent from the record. This arose by reason of the testator's treatment of his father, mother, and sister, which was resented by William. The sister died previous to the time the testator made his will. The last time that William and George spoke to each other was about a week before her death.

Mr. Blair, neighbor and beneficiary, saw the testator once a week over a period of ten years preceeding George's death. The testator had no car. Mr. Blair had taken George and his sister for auto rides on occasions and had done errands for them. The two families visited each other, and in fact Mr. Blair had befriended them in a general way. Mr. Blair never suggested to the testator that he make a will, nor did the latter discuss or mention to Mr. Blair that he intended to do so. The first knowledge that he gained of the will was at Mr. Ehrich's office on March 12, 1958. Referring to a short period after the will was executed, Mr. Blair testified: "I said, 'George, are you sure this is the way you want it?' And he said 'he knew what he was doing.' He said later, 'The only mistake I made in the will I didn't name your wife as co-beneficiary.'"

In referring to a conversation had with the testator, Ellen Corey, an acquaintance of forty years testified: "He said, 'Ellen, I am pretty happy. I have made my will and that is what Sarah and I wanted.' He says, 'I consider you and Wilbur (my husband) good friends of mine. That's why I am telling you this.' He says, 'I have other friends, the Cowans, Mrs. Montgomery, the Norrises, and Mr. and Mrs. Blair. Mr. Blair is my very closest friend. No one knows what they have done for me. When Sara was living they brought us food and Mrs. Blair came down with her vacuum and cleaned Sara's room and dusted while she was in bed. They brought our Christmas dinner to us. That's why I consider them, Harold Blair, my closest friend.'"

The undisputed evidence is that the testator was not a person to be easily influenced or swayed. We do not think that the friendly relations which existed between Mr. Blair and the testator, at least to the extent here appearing, is enough to raise a presumption of undue influence, or that the attending circumstances were such as to generate suspicion. Good-neighborliness or mere friendship is not sufficient. In a testamentary disposition, the law does not infer undue influence from the mere fact that one who is to profit by the instrument had an opportunity to impress his will upon the mind of the testator. It must appear that undue influence was actually exerted. *Kendall's Admr.* v. *Roseberry,* 120 Vt. 498, 503, 144 A.2d 836. There is no evidence that Mr. Blair exercised any influence or ascendency over the testator. Nothing appears to show that he advised the testator to make a will. The record fails to raise a presumption of undue influence. See *In re Barney's Will,* 70 Vt. 352, 40 A. 1027; *In re Moxley's Will, supra,* 112; *In re Collins Will, supra,* 533.

The court properly denied the contestant's motion for a directed verdict on the issue of undue influence. Furthermore, it submitted the issue of claimed undue influence on the part of Mr. Blair. It rightfully declined to charge that the relationship between Mr. Blair and the testator amounted to a confidential relationship creating a suspicion and a presumption of undue influence. The burden was therefore cast upon the contestant to show undue influence. The court submitted this issue and the jury by its verdict in favor of the proponent failed to find this to be a fact. No error appears on this point.

Lastly, the contestant claims error on the part of the trial court in not directing a verdict in his favor on the ground that the will was not drawn in accordance with his wishes and therefore did not comply with the provisions and requirements of the law. We start off with the undisputed fact that the testator informed Mr. Ehrich that he did not desire that his brother William receive any part of his estate. Under the terms of the will Mr. Blair was bequeathed and devised the entire estate, and in case he should predecease the testator then, and in that event, distribution was to be made to "such persons and in such proportions as shall at that time be prescribed by the laws of descent of the State of Vermont." Thus we have a variance between the testator's wishes and the legal effect and possible result of the language used by the draftsman. In commenting on this phase of the case the court charged "* * * even though there may have been a difference between the instructions of the testator to Mr. Ehrich and the will as drawn by Mr. Ehrich is this difference of such character that the document prepared by Mr. Ehrich still truly expresses the desires of the testator and is there a valid will?" While the contestant did not object to this instruction, having in mind the undisputed facts, the issue presented became legal rather than factual. Had William predeceased the testator the objectionable feature of the will would of course have been solved. The mistaken provision never went into effect, nor did it induce the essential and controlling provisions of the will. There is no claim of the existence of fraud in the preparation and execution of the will.

On this issue we have found no Vermont case in point, nor have any been cited by the parties, therefore we look elsewhere for assistance. Misunderstanding of the legal effect of the provisions of a will, whether resulting from erroneous legal advice or otherwise, will not in the absence of fraud or of undue influence defeat probate. *In re Gluckman's Will,* 87 N. J. Eq., 638, 101 A. 295, L.R.A. 1918D, 742. As stated in *Leonard* v. *Stanton,* 93 N. H. 113, 36 A.2d 271, "* * * according to the prevailing view, if the testator knew and approved the contents of his will, it is immaterial that he mistook the legal effect of the language used or that he acted upon the mistaken advice of counsel; provided that advice was given in an honest belief that it was sound." *Elam* v. *Phariss,* 289 Mo. 209, 217, 232 S.W. 693, 695. To

like effect, see *In re Gluckman's Will, supra,* 643, 644. Also see 1 Jarman, Wills, 7th ed. 34, 57 Am. Jur. Wills, §376, page 273. What the testator has done, not what he meant but failed to do, is to be given effect. *White* v. *Weed,* 87 N. H. 153, 155, 156, 175 A. 814. As was said by Vice Ordinary Reed in *In re Livingston's Will,* N. J. Prerog., 37 A. 770, cited in *In re Gluckman's Will, supra,* "It is said * * * that her instructions were not followed in drafting the will; * * * and that the will, as drafted * * * does not carry into effect that wish. * * * But whether it does or not, if she was capable of making a will, and there was no fraud practiced upon her by which she was misled into signing what she did not wish to sign (and there is no proof of fraud in this case), it would not matter what variation there might be between the instructions and the executed instrument." Further, as stated in 9 Wigmore on Evidence, 3rd Ed. §2476, as quoted in *Morrison* v. *Johnson,* 92 N. H. 219, 221, 29 A.2d 132, "* * * The rule against overthrowing the terms of a document by reason of a mistake of drafting * * *, or, what is the same, by declarations of a contrary intention * * *, is a legitimate one, and must be observed."

To hold here, under the facts, that the clause in question, which in this case does not come into effect, would defeat the will in its entirety in face of the express desire of the testator to leave his property to Mr. Blair, and so found by the jury, would be too harsh and unjust for our judicial sanction. Contestant's motion was properly denied.

*Judgment affirmed. To be certified to the probate court.*