NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 8

No. 23-AP-011

In re Estate of Donald Crofut
(Sean Hammond, Appellant)

Supreme Court

On Appeal from
Superior Court, Chittenden Unit,
Civil Division

June Term, 2023

Helen M. Toor, J.

Brian P. Hehir of Hehir Law Office, PLLC, Burlington, for Plaintiff-Appellant.

Daniel L. Burchard of McCormick, Fitzpatrick, Kasper & Burchard, P.C., Burlington, for Defendant-Appellee.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **WAPLES, J.** Beneficiary, Sean Hammond, challenges the civil division's decision to invalidate a portion of the will of testator, Donald Crofut, which granted beneficiary an option to purchase testator's residence for $40,000. Because we conclude that the underlying evidence supported the holding that the bequest was the result of undue influence and that a partial invalidation of the will was an appropriate remedy, we affirm.

I. Factual Background and Procedural History

¶ 2. The civil division found the following. Testator met beneficiary when testator was a volunteer at Allenbrook Home and beneficiary was a teenager residing there. Their encounter spawned a lifelong relationship in which testator served as a mentor and friend to beneficiary.

Testator visited beneficiary while beneficiary attended college out of state. When beneficiary was incarcerated, testator brought care packages and funded beneficiary's prison account. After beneficiary's release, testator helped him find a residence, purchase a car, and manage his finances. They spent time hiking and traveling together, with beneficiary viewing testator as a father figure. Beneficiary moved into testator's home in 2018.

¶ 3. That same year, testator was diagnosed with cancer, and while still active, became less able to care for himself over time due to his illness. Following the diagnosis, beneficiary took on additional responsibilities such as cleaning the house and running errands. Long-time neighbors Richard and Tracy Kozlowski also assisted testator with his medical appointments, groceries, and other tasks. Richard, a lawyer, served as testator's estate planning attorney, prepared testator's final and former wills, and was co-executor of testator's estate along with his wife, Tracy.

¶ 4. Testator made three successive wills beginning in 2020, each providing some option for beneficiary to purchase testator's Burlington home. Testator executed his final will from his bed on February 7, 2021, outside of the presence of beneficiary, and the civil division found testator was competent at the time. This will bequeathed to beneficiary an option to purchase testator's home for $40,000, well below the market value. The will specified that if beneficiary declined to exercise the option, the house would be sold, and the proceeds donated to a scholarship fund established in testator's name. If beneficiary bore the costs of upkeep, the will allowed him to live in the house until either the sale was completed or sixty days passed after he declined to exercise the option. Although beneficiary testified that he was unaware testator planned to provide such an option to him in the will, the civil division did not credit this testimony.

¶ 5. Testator passed away in April 2021. After testator's death, Tracy entered testator's residence with beneficiary's permission, seeking a container in which to store testator's ashes. While there, Tracy discovered that beneficiary's bedroom was filled with a considerable amount

2

of recently purchased consumer goods, many of which were left unopened in their packaging. These included sneakers, vacuums, lights, printers, and piles of clothes with store tags still attached. She also found buckets filled with cash, which beneficiary claimed came from years of tips, but that the court did not credit. Finally, Tracy discovered piles of receipts indicating beneficiary had used testator's debit card to make purchases, including on the day of testator's death, when beneficiary spent $1200 after learning of testator's passing. These receipts also showed that for the last three months of testator's life beneficiary had been withdrawing $400 each day from testator's checking account using the debit card provided by testator. Neighbors testified that they confronted beneficiary about what they found and he admitted that he had stolen money from testator. Testator was unaware of beneficiary's cash withdrawals and purchases.

¶ 6. Neighbors' discovery about beneficiary's use of testator's money resulted in both a criminal investigation for elder abuse and a probate proceeding to strike beneficiary's bequest under the will for undue influence. Following a hearing, the probate division determined that the option bequeathed to beneficiary was the result of undue influence and struck that provision from the will. Beneficiary then appealed to the civil division, where a two-day de novo bench trial was held. The evidence presented at trial consisted of photographs taken by neighbors of the consumer goods in beneficiary's room, photographs of the cash, photographs of various receipts and ATM withdrawals, months of testator's bank statements, and a forensic accounting analysis performed by a special administrator. The bank statements reflected daily withdrawals of cash, purchases aligning with the receipts found in beneficiary's bedroom, and wire transfers. Some of the bank statements contained handwritten notations from when testator balanced his account, but later statements, from after testator's immobility, did not contain such markings. The accounting analysis depicted how spending patterns related to testator's checking account increased exponentially around the time he became immobile.

3

¶ 7.     During the trial, the court took testimony from several witnesses, including testator's neighbors, beneficiary, and beneficiary's character witnesses.  Neighbors testified as follows.  Neighbors frequently heard beneficiary discuss how the house would be bequeathed to him in the will.  Beneficiary had pressured testator to also bequeath him testator's car, and this upset testator who believed beneficiary merely wanted to sell the car.  Although the will did not grant beneficiary the car, after testator's death, beneficiary claimed ownership of testator's car.  When neighbors confronted beneficiary about what they had found in his room, he admitted that he had "fucked up" and had stolen from testator.

¶ 8.     In his testimony, beneficiary presented a different view of the preceding events.  Beneficiary claimed that testator had a tenuous relationship with neighbors, and that Tracy was an unwelcome and meddlesome annoyance.  Beneficiary denied that he knew he was going to inherit from testator in the future and denied that he had stolen from testator.  Beneficiary claimed that testator gave beneficiary a debit card and PIN to purchase items for the home but told beneficiary that he was free to use it for whatever he wanted.  Beneficiary asserted that the cash found in his room was from previous employment.  Beneficiary stated he could not remember why he withdrew money in $400 increments or whether that coincided with the withdrawal limit of the ATM.  The civil division did not find this testimony credible considering the documentary evidence and neighbors' testimony.  Beneficiary also presented witnesses that testified to beneficiary's honesty and his efforts to care for testator, but the court was not persuaded of beneficiary's honesty when compared to the numerous untruths beneficiary told during his own testimony.

¶ 9.     The civil division ultimately held that the provision granting beneficiary the option to purchase testator's home for well below its market value was the result of undue influence.  The civil division found that testator was "extremely careful with money," "known for his penny-pinching," had "high moral and ethical standards," and would have terminated his relationship with beneficiary if he had discovered beneficiary's deceitful conduct.  The civil division noted that

4

testator had cut out his own daughter from his will because he believed all she was interested in was his money. The court determined that beneficiary "created an irresistible ascendancy by imperceptible means" by stealing from testator for months, even before the final will was signed. The court determined that, had testator known about the theft, he never would have included the option provision in his will and that "[s]ubverting the sound judgement and genuine desire of the individual, is enough to constitute undue influence." Finally, the civil division concluded that the undue influence could be purged by voiding the bequest to beneficiary without invalidating any other part of the will because the undue influence affected only that specific portion. Thus, the civil division affirmed the probate division and struck the provision of the will granting beneficiary the option to purchase testator's home at substantially below market value. This appeal followed.

## II. Legal Analysis

¶ 10. On appeal, beneficiary challenges the civil division's factual findings and legal conclusions. He alleges that the record does not support the civil division's findings that he stole from testator and that testator would have removed the option to buy the home if he had learned of beneficiary's theft. He next argues that the civil division erred in finding undue influence because testator was of sound mind and there was no evidence that he pressured or coerced testator. Beneficiary also claims the civil division committed legal error by voiding the grant to beneficiary instead of voiding the entire will. Finally, beneficiary claims the civil division's "affirmance" of the probate court decision illustrates its failure to engage in de novo review.

### A. Undue Influence

¶ 11. We first address beneficiary's arguments regarding undue influence. Beneficiary claims that the evidence does not support the civil division's conclusion that the bequest to him was the product of undue influence. He also asserts that there could be no undue influence because he did not engage in deception, did not steal from testator, and that testator was of sound mental and emotional condition. We give deference to the trial court's factual findings and will only set

5

them aside if they are clearly erroneous. Town of Bethel v. Wellford, 2009 VT 100, ¶ 5, 186 Vt. 612, 987 A.2d 956. "A trial court's findings will not be overturned merely because it is contradicted by substantial evidence; rather, [a beneficiary] must show there is no credible evidence to support the finding" at all. Id. (quotation omitted). "When reviewing the superior court's conclusions as to issues of law, our review is de novo." In re Soon Kwon, 2011 VT 26, ¶ 7, 189 Vt. 598, 19 A.3d 139.

¶ 12. In construing a will, the intent of the testator as expressed in a valid will must be enforced unless "it is shown to be the product of undue influence." In re Est. of Raedel, 152 Vt. 478, 481, 568 A.2d 331, 332 (1989). Undue influence can take the form of "whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammeled desire." In re Everett's Will, 105 Vt. 291, 315, 166 A. 827, 836 (1933). This includes "[a]ny species of coercion, whether physical, mental, or moral, which subverts the sound judgment and genuine desire of the individual" and can be "exerted either at the time of the act in question or over an indefinite prior period." In re Rotax' Est., 139 Vt. 390, 392, 429 A.2d 1304, 1305 (1981). In summation, undue influence "may result from conduct designed to create an irresistible ascendancy by imperceptible means" or "deceptive devices without actual fraud." Everett's Will, 105 Vt. at 315, 166 A. at 836.

¶ 13. Beneficiary argues that the civil division's factual findings are unsupported by the record and are insufficient to support the existence of undue influence. Beneficiary first challenges the civil division's finding that he stole from testator. There is ample evidence in the record to support the civil division's findings that beneficiary made unauthorized purchases with testator's debit card and unauthorized withdrawals from testator's bank account. See In re Est. of Doran, 2010 VT 13, ¶ 17, 187 Vt. 349, 993 A.2d 436 (citing Mullin v. Phelps, 162 Vt. 250, 260, 647 A.2d 714, 720 (1994)) ("[A] trial court's findings of fact will stand unless the beneficiary can show that there is no credible evidence to support them."). This evidence included photographs of the

6

consumer goods and cash, the bank records indicating excessive spending and cash withdrawals, the forensic account audit, and the testimony of neighbors as well as a special administrator. Testator's neighbor Richard testified that when confronted, beneficiary admitted to stealing from testator. The special administrator testified that the spending patterns of testator's bank account trended upward after he became homebound, including cash withdrawals in the amount of $400 a day, up to and after testator's death. Further, beneficiary's own testimony supports the civil division's determination that he was incredible. He contradicted his prior testimony on the issue of whether he had left his job to care for testator, and when questioned about the cash withdrawals, he frequently refused to answer the question or stated he could not remember. The trial court was free to weigh the credibility of his testimony against the circumstantial evidence and testimony of other witnesses in making its determination. See Id. ¶ 17 ("[I]t is for the fact-finder to assess the credibility of witnesses and to weigh the evidence, and we will not reweigh the evidence on appeal.").

¶ 14. Beneficiary also argues that the civil division's finding that testator would not have made the bequest at issue had he known about beneficiary's theft was erroneous, but this too is supported by the record. Beneficiary himself characterized testator as a "penny pincher" and admitted that if testator did not respect you, he would "give you nothing like he gave his daughter nothing in his will." Testator's neighbor and estate-planning attorney, Richard, testified that testator had explicitly disinherited his daughter after feeling like she only contacted him when she needed money. Testator's neighbor Tracy testified that beneficiary made comments to testator about being left his car in the will, making testator upset. Beneficiary denied that this conversation took place, but still claimed testator's car was his to testator's neighbors upon testator's death. Thus, the record supports the civil division's findings that beneficiary withdrew and used testator's funds without permission and that testator would not have bequeathed the option to beneficiary if

7

he had known about the theft. See Creed v. Clogston, 2004 VT 34, ¶ 18, 176 Vt. 436, 852 A.2d 577 ("We review the trial court's findings of fact under the clearly erroneous standard.").

¶ 15. Thus we turn to the question of whether this conduct amounts to undue influence. Beneficiary argues that a necessary element of undue influence is the testator's unsound mind. Because the civil division found testator was mentally competent at the execution of the will, he claims it erred in finding undue influence here. He further argues that there is no evidence that he engaged a "false persona" with the explicit intent of deceiving testator to benefit under his will, which beneficiary claims is required to show undue influence.

¶ 16. At the core of undue influence is the notion that through words and conduct the testator is deceived into acting in a manner that is outside of the testator's "normal tendencies and plans." Everett's Will, 105 Vt. at 300, 166 A. at 830 (quoting 3 J. Wigmore, Wigmore on Evidence § 1738(b) (1st ed. 1904). This Court noted, "[t]he influence can be exerted either at the time of the act in question or over an indefinite prior period," Rotax' Est., 139 Vt. at 392, 429 A.2d at 1305, and "may result from conduct designed to create an irresistible ascendancy by imperceptible means," Everett's Will, 105 Vt. at 315, 166 A. at 836. The testator's "mental and emotional condition" is relevant to this determination along with several other considerations. Id. at 299, 166 A. at 830 (quoting Wigmore, supra, § 1738(a). Mental infirmity is certainly not, however, a requirement for undue influence. In Everett's Will, we recognized that "undue influence and lack of testamentary capacity are separate and distinct issues," and while "the condition of a person's mind . . . is always an important question" where undue influence is asserted, "the mental condition of the testator. . . may be used as the basis" for determining whether the testator was constrained to do "that which is contrary to his own untrammeled desire." Id. at 299-300, 315, 166 A. at 829-30, 836. Other considerations include the testator's affection for the person, the testator's general testamentary attitude toward the person, and the testator's ability to resist the person. Here, the civil division properly considered all the facts and concluded that testator's

normal tendency was controverted in this case by beneficiary's deceitful acts. No concurrent finding of decreased mental capacity was required.

¶ 17. The party claiming undue influence ordinarily carries the burden of proof. Est. of Raedel, 152 Vt. at 481, 568 A.2d at 333. However, the burden shifts to the proponent of the will when suspicious circumstances arise around the execution of a will. Rotax' Est., 139 Vt. at 392, 429 A.2d at 1305. The sufficiency of evidence giving rise to suspicious circumstances is usually evaluated by the trial court on a case-by-case basis. Est. of Raedel, 152 Vt. at 482, 568 A.2d at 333. Suspicious circumstances may arise based on the relationship between the testator and beneficiary:

> [U]ndue influence may be presumed when relations between testator and beneficiary are suspect, such as those of guardian and ward, attorney and client, spiritual advisers and persons looking to them for advice—in fact, all relations of trust and confidence in which the temptation and opportunity for abuse would be . . . great . . . .

Landmark Tr. (USA), Inc. v. Goodhue, 172 Vt. 515, 525, 782 A.2d 1219, 1228 (2001) (quoting Raedel, 152 Vt. at 483, 568 A.2d at 334).

¶ 18. We conclude that there was undue influence in this case. First, beneficiary and testator were in a confidential relationship, shifting the burden to beneficiary to prove lack of undue influence. Here, the relationship between beneficiary and testator is "suspect, such as those of guardian and ward, attorney and client," etc., because it is a relationship "of trust and confidence in which the temptation and opportunity for abuse would be too great" were the beneficiary not required to prove their worthiness. Est. of Raedel, 152 Vt. at 483, 568 A.2d at 334. This gives rise to a presumption of undue influence which beneficiary must then rebut. See Landmark Tr. (USA), Inc., 172 Vt. at 525, 782 A.2d at 1228. The dissent disagrees with this conclusion, positing that mere friendship of the type here falls short of the requirements of a confidential relationship. Because beneficiary was not testator's fiduciary, guardian, medical provider, spiritual advisor, or the like, the dissent argues that their relationship does not justify shifting the burden of proof.

9

While our caselaw has previously determined that residence in the same home, friendship, and good neighborliness do not illustrate the existence of a confidential relationship, the facts here are distinguishable because beneficiary played the role of all the above. See In re Burt's Est., 122 Vt. 260, 266, 169 A.2d 32, 36 (1961); Miller v. Roseberry, 120 Vt. 498, 503, 144 A.2d 836, 839 (1958).

¶ 19. Far from "mere friendship," beneficiary served as testator's friend and confidant, he lived with testator in testator's home, and he helped provide care for testator during his immobility. Beneficiary not only understood that he would be left the house by testator, but also advocated for additional bequests such as testator's car. See In re Moxley's Will, 103 Vt. 100, 112 152 A. 713, 717 (1930) (noting in cases of undue influence typically "it appears that the beneficiary has procured the will to be made or has advised to its provisions"). Further, while this Court has never required the presence of a fiduciary relationship to initiate burden shifting in cases of suspected undue influence, such a relationship arguably existed here where testator provided authority to beneficiary to act as agent in utilizing his debit card to procure household goods, a duty beneficiary violated. See Est. of Kuhling by Kuhling v. Glaze, 2018 VT 75, ¶ 17, 208 Vt. 273, 196 A.3d 1125 (explaining the elements of an agency relationship). Because "the doctrine is applicable where a relationship of trust and confidence obtains between a testator and beneficiary," and such characteristics are present here as articulated above, we determine the burden must shift to beneficiary to rebut the presumption of undue influence. See Moxley's Will, 100 Vt. at 112, 152 A. at 717.

¶ 20. Beneficiary has failed to rebut the presumption of undue influence against his bequest because the civil division did not find his explanations for his conduct credible. When faced with the considerable evidence showing beneficiary stole large amounts of money from testator while he lay dying, beneficiary had little to say in response aside from "if that's what the record shows" and "I don't remember." The court similarly found beneficiary's response that the

large amount of cash in his bedroom was from years of tip wages and that testator permitted beneficiary to use the debit card for whatever he wanted to be incredible, especially in light of the photographs, bank statements, forensic auditing, and testimony of testator's neighbors. Beneficiary pretended to be a helpful friend, all the while stealing from testator when he was at his most vulnerable, conduct testator would surely not have rewarded with a bequest. Beneficiary notes that "the law does not infer undue influence from the mere fact that one who is to profit by the instrument had the opportunity to impress his will upon the mind of the testator." Burt's Est., 122 Vt. at 266, 169 A.2d at 36. However, the distinguishing factor here is that the suspicious circumstances arose from more than the fact that beneficiary would profit from the will.

¶ 21. The dissent disagrees with this analysis on the grounds that there is no direct link between beneficiary's theft from testator and the bequest at issue, arguing that beneficiary here did not supplant testator's true desires for the explicit purpose of taking under the will. We believe this to be too narrow an application of the law. While this may not be the conventional case of a beneficiary whispering into a testator's ear, the record is sufficient to show that beneficiary influenced testator in lying by omission. The dissent points out that testator had a history of frugality and resistance to influence, but this only strengthens our conclusion. The record was sufficient to support the inference that beneficiary, knowing he would take under the will, and knowing that testator would disapprove of his theft, lied by omission. We agree with the dissent that this Court's "overriding objective is to give effect to the intent of testators wherever possible," post, ¶ 35, which is why we refuse to sanction a bequest that contravenes this intent, as illustrated by the evidence. Further, where, as here, a testator includes a residual clause to a specific bequest, the concern of contradicting testator's intent through voidance of a specific provision is much less consequential because testator has presented an alternative of intents. In re Est. of Holbrook, 2016 VT 13, ¶ 29, 201 Vt. 254, 140 A.3d 788 (noting courts evaluate instrument as a whole in determining testamentary intent).

11

¶ 22. Beneficiary was in a position of power over testator due to his physical condition, with the opportunity to deceive testator and convert his property, which beneficiary acted upon. Indeed, if not for testator's health challenges, beneficiary would likely have been unable to steal from testator due to testator's diligent financial record-keeping. Because there were suspicious circumstances, beneficiary bore the burden of demonstrating a lack of undue influence. Beneficiary did not meet that burden. Beneficiary concealed his theft from testator because he likely knew that testator would disapprove, and his argument that this conduct falls outside of undue influence employs too narrow a reading of the law and would unjustly enrich beneficiary in the face of egregious conduct.

### B. Partial Voidance

¶ 23. Beneficiary next argues that the court committed legal error in voiding just the portion of the will related to him. With no citation, beneficiary claims that the practice of Vermont courts is to not allow partial voiding of certain will provisions.

¶ 24. We conclude that partial voidance is an acceptable remedy when undue influence is found in that it best preserves the testator's intent and effectuates the testator's desires. Our overarching purpose in construing a will is to "is to ascertain the intention of the testator." Est. of Holbrook, 2016 VT 13, ¶ 29. The provision at issue in this case is a small part of a much larger will that includes bequests to approximately twenty other individuals and entities, and amounts to between one and five million dollars. The evidence of undue influence is disconnected from these other bequests and individuals. If the entire will was invalidated, testator's wishes would be wholly ineffectual. Therefore, invalidating an entire testamentary instrument based on the deficiency of one particular portion contravenes the desires of the testator. See Est. of Raedel, 152 Vt. at 481, 568 A.2d at 332 (noting "courts are bound to enforce the intent of the testator"). If we were to invalidate testator's entire will here, the laws of intestacy would likely direct his estate to

be descended to his daughter, whom he explicitly disinherited from his will. It cannot be said that doing so here would live up to testator's intent.

¶ 25. This conclusion is in keeping with many of our northeastern sister jurisdictions that have also allowed preservation of parts of a will. See, e.g., Edgerly v. Barker, 31 A. 900, 910 (N.H. 1891) ("Courts lean in favor of the preservation of all such valid parts of a will as can be separated from those that are invalid, without defeating the general intent of the testator." (quotation omitted)); In re Carother's Est., 150 A. 585, 586 (Pa. 1930) ("Where a provision in a will which gives a legacy is void because of undue influence, the will itself is not necessarily void nor are other legacies, unless such influence directly or impliedly affects them."); In re Hitchcock's Will, 118 N.E. 220, 223 (N.Y. 1917) ("The principle is now well settled that the courts lean in favor of preservation of such valid parts of a will as can be separated from those that are invalid without defeating the general intent of the testator."); Wellman v. Carter, 190 N.E. 493, 498-99 (Mass. 1934) (noting "only parts of the instrument affected by undue influence of a named person are to be set aside"). The primary reason stated for allowing this was to ensure enforcement of the general intent of the testator, especially where, like here, a residual clause follows the invalidated provision. See Carother's Est., 150 A. at 586 ("Where legacies or bequests are declared void for any reason, and the will contains a residuary clause disposing of the residue of an estate, the bequests invalidated pass under the residuary clause, unless the scheme of the will or testator's intention provides otherwise."). Therefore, we join those courts in holding that as a general matter, portions of a will may be invalidated to remedy a bequest that is the result of undue influence. We conclude that this remedy was appropriate here.

## C. Review by Civil Division

¶ 26. Finally, beneficiary argues that the civil division's order "affirming" the decision of the probate division renders its decision infirm because the civil division was required to engage in de novo review. See 12 V.S.A. § 2553; see also In re Peter Val Preda Trusts, 2019 VT 61, ¶ 5,

13

210 Vt. 607, 218 A.3d 27 (noting civil division has jurisdiction of probate appeals unless otherwise provided). Use of the word "affirm" does not vitiate the court's de novo review of the probate division ruling. Here, the civil division held a two-day bench trial, taking evidence and testimony in supplementation of the record, and fashioning an order without reliance on the probate court ruling. It is clear from the record that the civil division undertook an independent review of the evidence and law before coming to its conclusion, without deference to the probate division's order. Thus, the civil division employed the correct standard of review, and its order is free from error based on such a challenge.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 27. **CARROLL, J., dissenting.** To prove that a will beneficiary unduly influenced a testator in creating a will, our case law requires a showing that the beneficiary has destroyed the testator's free agency and, in effect, replaced it with the beneficiary's own at the time the will was executed. Based on the facts found below and applying the correct legal standard, beneficiary Hammond did not unduly influence testator Crofut to devise an option to purchase testator's house for $40,000, an amount below fair-market value. Accordingly, I respectfully dissent.

¶ 28. As an initial matter, the majority incorrectly concludes that beneficiary bears the burden to prove that he did not unduly influence testator's February 7, 2021, will. Ante, ¶¶ 17-18. He does not. Will contestants—neighbors here—ordinarily carry the burden to prove undue influence. In re Est. of Raedel, 152 Vt. 478, 481, 568 A.2d 331, 332 (1989). However, that burden shifts to will proponents when suspicious circumstances are present. Id. We have identified that certain relationships between testator and beneficiary can give rise to suspicious circumstances.

14

Examples include relationships "such as those of guardian and ward, attorney and client, spiritual advisors and persons looking to them for advice," or indeed "all relations of trust and confidence in which the temptation and opportunity for abuse" is great.[1] Landmark Tr. (USA), Inc. v. Goodhue, 172 Vt. 515, 525, 782 A.2d 1219, 1228 (2001) (quotation omitted).

¶ 29. The majority concludes that beneficiary had a "confidential relationship" with testator giving rise to suspicious circumstances, which shifts the burden to beneficiary to disprove undue influence. Ante, ¶ 18. The record is bereft of any evidence indicating that this relationship was "confidential" in the manner intended by our case law. Beneficiary was not testator's fiduciary, not his guardian, not his doctor or nurse, and not his spiritual advisor. After decades of friendship, and a relationship in which beneficiary viewed testator as a "father figure," beneficiary was one of testator's caretakers once testator became homebound in the final stages of his illness.[2] But this hardly, without more, amounts to a privileged relationship justifying the burden shift. See Est. of Raedel, 152 Vt. at 483-84, 568 A.2d at 334 (holding that nonfiduciary beneficiaries who were testator's nieces and who inherited farm, expressed interest in inheriting farm, did not assist in preparing will, helped care for testator during illness, urged testator to seek legal advice regarding estate, and discouraged other nieces and nephews from contacting testator did not amount to suspicious circumstances); see also In re Moxley's Will, 103 Vt. 100, 112-13, 152 A. 713, 717 (1930) (holding that no suspicious circumstances existed between nurse-beneficiary and testator where testator was of sound mind at time of will execution, nurse not present at will execution, and had nothing to do with will preparation). Mere friendship is not enough to raise the presumption of suspicious circumstances either. In re Burt's Est., 122 Vt. 260, 266, 169 A.2d

_____

[1] The trial court compared beneficiary's and testator's relationship to a doctor and patient.

[2] Testator was visited by nurses several times per week until he entered round-the-clock, home-hospice care before his death in April 2021.

32, 36 (1961) (stating that "[g]ood-neighborliness and friendship is not sufficient" to show existence of confidential relationship and that "[i]n a testamentary disposition, the law does not infer undue influence from the mere fact that one who is to profit by the instrument had an opportunity to impress his will upon the mind of the testator. It must appear that undue influence was actually exerted."). The burden to prove beneficiary unduly influenced testator should have remained with neighbors.

¶ 30. Even if neighbors were required to bear the burden to prove undue influence, their claim still fails on this record. Our leading case on the issue of undue influence explains that:

> [u]ndue influence . . . means whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammeled desire. It may be caused by physical force, by duress, by threats, or by importunity. It may arise from persistent and unrelaxed efforts in the establishment or maintenance of conditions intolerable to the particular individual. It may result from conduct designed to create an irresistible ascendency by imperceptible means. It may be exerted by deceptive devices without actual fraud. Any species of coercion, whether physical, mental, or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute undue influence. Its extent or degree is inconsequential as long as it is sufficient to substitute the dominating purpose of another for the free expression of the wishes of the person signing the instrument. The nature of undue influence is such that it often works in veiled and secret ways; hence it is impossible to lay down any hard and fast rule by which its exercise must or may be manifested. Direct evidence of it is seldom available. Nor is this necessary, since it may be shown by circumstances which have a legitimate tendency to prove that it was used. The nature of the testamentary disposition, as we have seen, whether natural or unnatural, may be considered in connection with other evidence under the issue of undue influence. Opportunity must necessarily be shown, but opportunity alone does not justify the inference of undue influence. Furthermore, influence by whatever means exerted, and however urgent and persistent, will not suffice to []void a will unless carried to the point of destroying the free agency of the testator. Neither suggestion, solicitation, advice, nor importunity, unless carried to the extent indicated, will []void a will.

In re Everett's Will, 105 Vt. 291, 315, 166 A. 827, 836 (1933) (citations omitted). As is clear from that discussion, undue influence requires volitional conduct to achieve specific ends—a benefit in

16

the will created by a testator whose own free agency has been destroyed and has therefore done something "which is contrary to his own untrammeled desire." Id.

¶ 31. There is no evidence that beneficiary's conduct destroyed testator's free agency and supplanted it with beneficiary's own. The majority holds, without citation, that beneficiary's conduct, including stealing money and enjoying a position of physical power over testator, when viewed in light of the "suspicious circumstances" of their "confidential" relationship, amounts to undue influence. Ante, ¶ 18. But the majority, in my opinion, misapplies the legal question it correctly cites elsewhere: whether beneficiary's conduct constitutes "[a]ny species of coercion, whether physical, mental, or moral, which subverts the sound judgment and genuine desire of the individual" at the time the individual executed the will in question. In re Est. of Rotax, 139 Vt. 390, 392, 429 A.2d 1304, 1305 (1981) (quotation omitted); see In re Soon Kwon, 2011 VT 26, ¶ 7, 189 Vt. 598, 19 A.3d 139 ("When reviewing the superior court's conclusions as to issues of law, our review is de novo."). Beneficiary's conduct was certainly odious, but only conduct amounting to an influence sufficient to destroy testator's free agency can "[]void a will." Everett's Will, 105 Vt. at 315, 166 A. at 836.

¶ 32. The trial court found that testator had the requisite capacity to execute the February 2021 will, which was videotaped. Beneficiary was not present. The court found credible that beneficiary knew about testator's intention to devise to beneficiary the house in some respects, but no evidence suggests that he knew about the precise terms of the purchase option or that he ever specifically discussed the topic with testator. Nor is there any "evidence that [beneficiary] exercised any influence or ascendancy over . . . testator." Burt's Est., 122 Vt. at 266, 169 A.2d at 36. Testator was "extremely frugal," had " 'high moral and ethical standards,' and did not tolerate any deceit or deception." For example, in the summer of 2020, testator became upset after beneficiary pressured testator to leave testator's car to beneficiary because testator thought beneficiary "just wanted to sell the car for cash." Testator did not bequeath the car to beneficiary.

17

Testator had cut his daughter out of his will because he thought she only cared about money. He had once evicted a tenant because the tenant did not repay a loan. The majority also characterizes beneficiary's relationship to testator as one "in a position of power" due to testator's physical condition. Ante, ¶ 22. However, this does not amount to "influence or ascendancy" to such an extent that testator's free agency was destroyed on February 7, 2021. See Moxley's Will, 103 Vt. at 112, 152 A. at 717. There is no evidence that beneficiary used his relative strength to coerce testator in any respect, including executing any will or provision of a will, and neighbors do not dispute that beneficiary continued to perform caretaking duties for testator throughout testator's illness.[3]

¶ 33. Even if, as the majority concludes and the trial court found, testator would have cut beneficiary out of his will if testator had known about beneficiary's conduct, that counterfactual fails to demonstrate that beneficiary's conduct destroyed testator's free agency and resulted in testator signing a will that expressed an intent other than his "untrammeled desire." Cf. Everett's Will, 105 Vt. at 319-20, 166 A. at 836-38 (holding that wife unduly influenced husband by creating an "irresistible ascendancy by imperceptible means" where wife benefitted under the will after influencing husband to terminate contact with daughters, isolated and manipulated husband over a period of years, and arranged very large sums of capital including cash, real estate, and stocks in multiple corporations to be gifted to her and her children from a previous marriage during husband's life and with husband's knowledge). Beneficiary's conduct was hardly "an irresistible ascendancy by imperceptible means"—there is simply no connection between his apparent covert misuses of testator's debit card and testator's devise to him of a purchase option of his house for

---

[3] Whether, as the trial court found, beneficiary "pretended to be a selfless assistant" or not does not change the fact that beneficiary was not using his position of power to coerce or influence testator on the basis of beneficiary's relative strength.

18

$40,000, an amount beneficiary clearly did not possess of his own accord.[4] Indeed, the will provision gave beneficiary only nine months to exercise the option, during which he would bear "the costs of all ordinary maintenance, repairs, taxes, utilities, insurance and other operational costs." This hardly has the appearance of a sophisticated, frugal, wealthy, and careful testator's will being overborne by this particular beneficiary.[5]

¶ 34. "The undisputed evidence is that . . . testator was not a person to be easily influenced or swayed." Burt's Est., 122 Vt. at 266, 169 A.2d at 36. "There is no evidence that" beneficiary "exercised any influence or ascendancy over" testator. Id. "Nothing appears to show that" beneficiary "advised . . . testator to make a will." Id. This was not a confidential relationship. It was a decades-long friendship, and the two men lived together. Beneficiary visited testator daily when testator was hospitalized for several months in early 2020. Beneficiary was one of testator's caretakers when testator returned home from the hospital, and testator apparently trusted beneficiary to such an extent that he let beneficiary use his debit card for at least several months before testator executed the February 2021 will.

¶ 35. Whatever one thinks of beneficiary's conduct, the question is whether, taken together, it supplanted testator's free agency on February 7, 2021. See, e.g., Everett's Will, 105 Vt. at 319-20, 166 A. at 838 ("While [the evidence] did not tend to show that at the time the instrument in question was made [the testator] lacked testamentary capacity in the sense that he was incapable of making a will if left to his own untrammeled wishes in the matter, it did tend to

---

[4] The trial court did not suggest that beneficiary was misappropriating cash from testator in order to obtain the $40,000 to purchase the house. In fact, it found that beneficiary had been spending a great deal of the money on personal property including at Best Buy, Kohl's, Old Navy, and Walmart.

[5] As the trial court noted, no property assessment was submitted. Accordingly, though the court found that the house is "undoubtedly worth significantly more than" $40,000, it is not possible to discern precisely how much more.

show that [the beneficiary] had succeeded in implanting in his mind a feeling of ill will, bordering on hatred, towards his older daughters, which continued to the time the instrument was made, and that she, by various means, had acquired such control over him that his acts and conduct regarding his business affairs, whether large or small, reflected her will respecting the same, whenever she sought to exert it, rather than his own."). I cannot conclude as a matter of law that testator's free will was destroyed by beneficiary's fraudulent conduct when he executed his final will on February 7, 2021. Without any evidence or factual findings connecting beneficiary's conduct to testator's free agency on February 7, 2021, mere conduct that the beneficiary wished to keep hidden is not the kind of volitional or coercive conduct that we have long held constitutes undue influence. See, e.g., id. at 315, 166 A. at 836. Lying by omission and incredible testimony, as our case law bears out, do not void a will by themselves. Our overriding objective is to give effect to the intent of testators wherever possible, which is why we require testators to state their "dispositive wishes clearly and appropriately." In re McCoy's Est., 126 Vt. 28, 30, 220 A.2d 469, 471 (1966). Testator has done so, and I would enforce his will as written.

¶ 36.    Accordingly, I respectfully dissent.

_____
Associate Justice

20